1  Paul S. White, Esq., SBN 146989
   pwhite@tsmp.com
2  Jeanne S. Kuo, Esq., SBN 231441
   jkuo@tsmp.com
3  TRESSLER, SODERSTROM, MALONEY
   & PRIESS, LLP
4  1901 Avenue of the Stars, Suite 450
   Los Angeles, CA 90067
5  Telephone:    (310) 203-4800
   Facsimile:    (310) 203-4850
6

7  Attorneys for Plaintiff
   CHUBB CUSTOM INSURANCE COMPANY
8

FILED

JUN 1 7 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                         DEPUTY

9              UNITED STATES DISTRICT COURT          BY FAX

10            SOUTHERN DISTRICT OF CALIFORNIA

11

12  CHUBB CUSTOM INSURANCE COMPANY,    CASE NO. 08 CV 1074 BTM CAB
    a Delaware corporation,

13                                     PLAINTIFF'S COMPLAINT FOR
                                       DECLARATORY RELIEF
                     Plaintiff.
14       vs.

15

16  THE ALLEN EARLEY 1998 FAMILY TRUST,
    a California trust; ALLEN EARLEY
    PLANTERS PROJECT, LP, A California
17  Limited Partnership ' DOES 1 THROUGH 10

18                   Defendants.

19

20       Plaintiff, CHUBB CUSTOM INSURANCE COMPANY, a Delaware corporation ("Chubb

21  Custom"), hereby alleges as follows:

22                              **PARTIES**

23       1.     Chubb Custom is a corporation incorporated under the laws of the state of

24  Delaware, with its principal place of business in New Jersey.

25       2.     THE ALLEN EARLEY 1998 FAMILY TRUST is a California trust, with its

26  address at 2802 Winona Ct., Imperial, CA 92251 ("Allen Earley Trust").

27

28                              1                    ☐ ORIGINAL

CR

3.    ALLEN EARLEY PLANTERS PROJECT LP is a California Limited Partnership with its address at 2802 Winona Ct., Imperial, CA 92251. ("Allen Earley Planters Project") (The Allen Earley Trust and Allen Earley Planters Project are collectively referred to "the Insureds" and/or "Insured Defendants" herein).

4.    Based on information and belief, the Allen Earley Trust and the Allen Earley Planters Project were, *inter alia*, the owners and developers of commercial real estate and, in particular, a commercial property in Brawley, California known as the Planters Hotel.

### JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C.A. § 1332(a)(1) (citizens of different states where the amount in controversy exceeds $75,000).

6.    Venue is in this district is proper in the Southern District of California, pursuant to 28 U.S.C.A. § 1391(b), as a substantial part of the events giving rise to the action occurred in Imperial County, California.

### GENERAL ALLEGATIONS

7.    Chubb Custom issued Commercial Property Policy Number 79553787-00 ("the Policy") to the named insured, "The Allen Early [sic] 1998 Family Trust, Allen Early [sic] Planters Project LP, 2802 Winona Court, Imperial, California 92251" for the policy period August 1, 2006 to August 1, 2007. A certified copy of the Policy is attached as Exhibit A.

8.    In relevant part, the Policy provided that: "We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." The Property described in the declarations is the Planters Hotel building, which has as its address, 2802 Winona Ct., Imperial, CA 92251.

9.    The insured property, the Planters Hotel, was destroyed by fire in the early morning hours on March 7, 2007.

10.    Prior to the fire, as commercial developers, the Insured Defendants were engaged in renovating the Planters Hotel and were utilizing it as a retail center and office space for the region.

2

1   At the time of the fire, a majority of the Planters Hotel had yet to be renovated and a majority of

2   the Planters Hotel was not yet occupied.

3       11.   The Chubb Custom Policy contains the following "Protective Safeguards"

4   Endorsement ("PSE"), which has a condition to coverage in Section A and specific exclusionary

5   language in Section B.

6       **A...PROTECTIVE SAFEGUARDS**

7       1.   As a condition of this insurance, you are required to maintain the
            protective devices or services listed in the Schedule above [P-1].
8

9       2.   The protective safeguards to which this endorsement applies are identified
            by the following symbols:
10

11      **"P-1" Automatic Sprinkler System,**

12      including related supervisory services.  Automatic Sprinkler System means:

13      a.   Any automatic fire protective or extinguishing system, including
            connected:
14

15           (1)   Sprinklers and discharge nozzles;
             (2)   Ducts, pipes, valves and fittings;
16           (3)   Tanks, their component parts and supports; and
             (4)   Pumps and private fire protection mains.

17      b.   When supplied from an automatic fire protective system:
18
             (1)   Non-automatic fire protective systems; and
19           (2)   Hydrants, standpipes and outlets.

20                                     * * *

21      B.   The following is added to the EXCLUSIONS section . . .

22           We will not pay for loss or damage caused by or resulting from fire, if
23           prior to the fire, you:

24           1.   Knew of any suspension or impairment in any protective safeguard
                  listed in the Schedule above and failed to notify us of that fact; or
25

26           2.   *Failed to maintain any protective safeguard listed in the*
                  *Schedule above, and over which you had control, in complete*
27                *working order.*

28
                                        3

> If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads notification to us will not be necessary if you can restore full protection within 48 hours.

(Emphasis added.)

12.    Subsequent to the fire, on March 7, 2007, the Insureds submitted a "Property Loss Notice" relative to the fire at the Planters Hotel to Smith Kandal Insurance Agency for presentation to Chubb Custom under the Policy.

13.    Upon receipt of the claim relative to the fire, Chubb Custom commenced its investigation into coverage for the fire loss. Over the course of its investigation, Chubb Custom interviewed tenants, contractors, representatives of the Insureds, including discussions with the Insureds' legal counsel, persons affiliated with the property, and/or other persons with knowledge relative to the building, maintenance of the building, and of the fire itself.

14.    By its investigation, Chubb Custom sought to learn all facts bearing on the analysis of coverage, including but not limited to, the source, cause and origin of the fire, and the operating condition of the Planters Hotel sprinkler system before and at the time of the fire.

15.    Over the course of approximately March 2007 to November 2007, Chubb Custom worked to investigate the loss, diligently communicated the ongoing status of its investigation to the Insureds, worked closely with the Insureds and the Insured's counsel, sought additional information from the Insured and other third-parties, including but not limited to, the City of Brawley and the Brawley Fire Department, and advised the Insureds as to pertinent facts being developed relative to coverage and the loss.

16.    As part of Chubb Custom's investigation, the Insureds' representative, Mr. Allen Earley, participated in two Examination Under Oath proceedings, the first on September 13, 2007, and the second on October 29, 2007.

17.    During its investigation, Chubb Custom learned that the water supply to the automatic sprinkler system was off at the time of the fire. It subsequently learned that the

4

1  automatic sprinkler system was off prior to the fire.  Chubb Custom advised the Insureds of this
2  information as its investigation continued and the possible application of the PSE to preclude
3  coverage for the loss.  As part of its investigation, Chubb Custom sought additional information
4  from the Insureds (and/or other third parties with knowledge) relative to whether the building
5  sprinkler system had water running to it at the time of the March 7, 2007, fire.

6      18.    Ultimately, Chubb Custom's investigation concluded that the fire suppression
7  sprinkler system in the Planters Hotel was not maintained in complete working order and was, in
8  fact, not operable at the time of the March 7, 2007, fire; specifically, the water to the system was
9  turned off at the time of the fire.

10     19.    By letter dated November 19, 2007, Chubb Custom disclaimed coverage for the fire
11  loss to the Planters Hotel on the basis that its Policy's PSE, noted above, applied and precluded
12  coverage.

13     20.    Information obtained by Chubb Custom in the course of its investigation confirms
14  that the Insured Defendants did not "maintain" the Planters Hotel Sprinkler System and that the
15  system was not "in complete working order" at the time of the fire (as water to the system was off
16  before and at the time of the fire).  Specifically in this regard, the "Planters Hotel Investigation"
17  report authored by Captain Mark Franks, Arson and Bomb Investigator, Brawley Fire Department
18  states, in relevant part, that on March 14, 2007:

19          . . . water was pumped out from the basement and the team entered the basement
            [of the Planters Hotel].  The fire sprinkler system control valve was identified and
20          inspected.  *The control valve was in the closed position and was not secured
            with the required padlock and chain.*  To confirm these findings, I had a certified
21          expert of building fire sprinkler systems from Western Fire Protection Inc. inspect
            the control valve.  *The inspector confirmed that "the system control valve (an 8
22          inch O.S.&Y) was in the closed position indicating the fire sprinkler system was
            not active at the time of the fire."*
23

24  (Emphasis added). (Fire Department Report attached as Exhibit B).

25     21.    Additionally, the Fire Department report states that: (1) immediately following the
26  fire, the control valve that supplies water to the Hotel's fire suppression system was in the off
27  position; (2) the closed position of the valve indicates that the "fire sprinkler system was not active

28                                          5

1  at the time of the fire;" and, (3) prior to the fire, the control valve was "not secured with the

2  required padlock and chain."

3      22.    The report concludes and notes the following "Contributory Factors" to the fire: 1.

4  Arson Multiple Origin Points; 2. *Fire Sprinklers Deactivated; 3.* Opportunity for access (unlocked

5  doors); 4. Two Structure fires at the same time located seven blocks from each other; 5. Type of

6  Rehab of interior of building (several holes in walls, etc.);  6. On-Duty Staffing. . .five man engine

7  company. (Emphasis added).

8      23.    The day before the fire, on March 6, 2007, Captain Jesse Zendejas of the Brawley

9  Fire Department conducted an inspection of one of the tenant properties at the Planters Hotel. As

10  part of his inspection, Captain Zendejas inspected the Building's fire suppression system and noted

11  that the water valve to the system was in the "off" position.

12      24.    Captain Zendejas has documented this finding in an April 13, 2007, Memorandum

13  (attached as Exhibit C): "I noticed that the riser fixture had a gauge that indicated a pressure of 0. I

14  also noticed that the riser's main valve, which was of the outside stem and yoke type (OS&Y)

15  appeared to be in the closed position. I pointed out to CPF Jasso that when the stem in the center

16  of the valve wheel is in and not showing, means [sic] that the valve is closed."

17      25.    Additionally, March 28, 2007, correspondence from the Insured's attorney, Douglas

18  Heumann, confirms that one of the Insureds' representatives, Luis Torres, was at this inspection:

19      I spoke with Luis on May 18th at my office in El Centro. . .Luis told me he was at
        the inspection with Captain Zendejas. . .Captain Zendejas asked Luis if he could
20      look at the sprinkler system main valve after Captain Zendejas denied the permit
        and issued Luis the denial. Luis did not know where this was but told the Captain
21      that the basement had 'a bunch of pipes.' He and the Captain went down to the
        basement *and the Captain pointed out to Luis that the system was off.*
22

23  (Emphasis added) (Correspondence attached hereto as Exhibit D).

24      26.    In the course of its investigation into this claim, Chubb Custom retained a fire

25  suppression expert, Steve Sheldon of Rolf Jensen & Associates, Inc., Fire Protection

26  Consultants. Mr. Sheldon provided a final report to Chubb Custom on or about June 26,

    2007 (attached as Exhibit E).

27

28                                              6

27.     Sheldon's June 26, 2007, Report states, in relevant part:

At the time of my on-site activities I observed that the main sprinkler valve that is located interior to building and in the basement was closed. At that time I also noted that the fire sprinkler system drain valve was in the fully open position. The fire system drain valve is typically opened to drain the system of water prior to performing work on the sprinkler system. *Based on visual on-site observations, review of the Brawley Fire Department Investigation Report, and my May 9, 2007 phone conversation with Captain Zendejas of the Brawley Fire Department, the installed fire sprinkler system was not operational at the time of the fire.* At this time it is not known when the sprinkler system control valve was shut or by whom. Based on the writer's experience, it is more likely than not that the sprinkler system valve was closed by a fire protection contractor or other person knowledgeable in sprinkler system operations. The basis for this opinion is due to the fact that the sprinkler system drain valve was open.

The main sprinkler shut-off valve is located in the basement of the building which is accessible only from a single door located on the south side of the building and out of public view. The owner has stated that he entered the basement at least monthly but was not intimately familiar with the fire protection system or main shut-off control valve. It is unknown specifically who had access to the basement area or whether the basement access door was normally locked.

Based on the owner's recorded statement and information provided by the cause and origin investigator, a fire alarm panel was present within the first floor hotel lobby of the building. It is unknown when this panel was installed or specifically its function. The owner has stated that the panel was not connected to an off-site monitoring service. Reportedly, the panel was displaying a lit yellow light prior to the fire. Yellow fire alarm panel lights are typically used to indicate a "trouble" condition on the system. A trouble condition indicates that something adverse has been detected which may preclude the system from functioning properly. Typically, a local audible alarm such as a buzzer or horn would sound from the alarm panel upon the detection of a trouble condition. The local alarm would also normally have to be silenced through a push-button acknowledgement of the trouble condition at the fire alarm panel. At the time of my site visit I observed that a waterflow alarm device had been installed immediately downstream of the fire sprinkler system shutoff valve. It is unknown whether or not the waterflow alarm device is connected to the fire alarm panel or if the reported trouble signal was caused by the waterflow switch.

* * *

During my on-site activities I noted approximately six different sprinkler head styles and associated manufacturing dates. The newest sprinkler model noted was 2002. I also noted a sidewall sprinkler head which had exhibited signs of leakage. Based on the owner's tape recorded statement, there had been at least four tenant improvement projects (Nextel, American Title, Paddy's Bar, Hair Salon) that were

7

either completed or ongoing. Based on the owner's description of the projects, it is likely that the sprinkler system was shut down one or more times to accommodate sprinkler system modifications or to prevent accidental sprinkler discharge.

Reportedly, the Brawley Fire Department denied a tenant improvement permit based on the sprinkler system being "too old". Based on the requirements and commentary within NFPA 25, sprinklers that are older than 50 years are required to be operationally tested every 10 years. In doing so, a representative sample (1% of each sprinkler type) is to be removed from the system and sent for testing by an independent lab. If one or more of the sample sprinklers fail to operate properly, then all of the system sprinklers are to be replaced. Based on sprinklers which were installed in 1927, four sets of representative samples should have been sent out for testing to date; there is no evidence that this has occurred.

*It is incumbent upon the building owner to comply with all codes, ordinances and applicable requirements related to the use and occupancy of their building. The owner was not diligent in his efforts to understand and comply with requirements related to the inspection, testing and maintenance of the fire sprinkler system, and was not diligent in his efforts to submit permits and perform renovations in accordance with the applicable building code.*

Additionally, the Brawley Fire Department failed to establish written policies and procedures related to the inspection, testing and maintenance of fire sprinkler systems, and the Brawley Building Department failed to diligently enforce compliance with their building code as it relates to the use, renovation and change of occupancy of a structure.

(Emphasis added).

28.    Thus, based upon the above, Mr. Sheldon's report concludes:

In summary, it is my opinion that the owner did not comply with the expected standard of care related to the inspection, testing, and maintenance of the fire protection system. Additionally, there are specific requirements in the currently adopted code that requires the owner to obtain permits for work within the building, as well as to maintain all fire protection systems in an operative condition at all times and to provide a fire watch when entire fire protection systems are shut down; the owner clearly did not comply with these code requirements.

29.    On September 13, 2007, Chubb Custom conducted an EUO of Mr. Allen Earley, the principal representative of the Insureds who oversaw the Planters Hotel. At the September 2007 EUO, Mr. Earley testified that, prior to the fire, he did not know that there was an on/off valve controlling the water supply to the automatic sprinkler system in the basement of the Planters

1 Hotel. Mr. Earley learned of the existence of this valve months after the March 2007 fire. He also

2 testified that he did not know whether anyone had ever checked whether the valve to the fire

3 suppression system was in the on position.

4     30.    Specifically, Mr. Earley testified that he "didn't understand exactly how the fire

5 suppression system worked before the [fire]" and that he "paid little attention" to the system. When

6 asked at the EUO whether he understood, prior to the fire, that the sprinkler system had a water

7 shut-off valve, Mr. Earley responded: "No sir. Nor the value of it . . ."

8     31.    Mr. Earley testified that he did not know how to read any of the lights on the fire

9 panel. "I did not observe any warning lights, nor did I understand what any of the lights were for at

10 all. I have a fire panel in a building, one of my other commercial buildings. I don't understand

11 what it does, either."

12     32.    Mr. Earley also testified that that every now and then the alarm would go off and

13 Mr. Earley would check to see if there was any fire on the premises and would then reset the

14 system but that he never bothered to figure out why the system bell had gone off in the first place:

15 "Q: Were you able to turn the bell off once it started ringing? A: Yeah. I think you just hit the

16 reset button and it stopped. Q: Did you ever figure out why it went off? A: No, sir. It would go

17 off routinely."

18     33.    Mr. Earley also told Chubb Custom at the EUO that he did not personally inspect

19 the fire suppression system or retain the services of any professional inspection company to inspect

20 or maintain the system. Mr. Earley testified that he was not aware of anyone ever having worked

21 on the fire suppression system in any manner (repairs, improvements, etc) and he did not know

22 whether the system had ever been checked to see if there was any water pressure in it. "I never had

23 any work done on the fire suppression system."

24     34.    Mr. Earley also testified that he had control over the fire suppression system and

25 access to it and that he was the one who was "responsible."

26     35.    Finally, at the EUO, Mr. Earley admitted that an operable fire suppression system at

27 the Planters Hotel could have suppressed or contained the fire and protected the Hotel from a

28

9

1   catastrophic fire loss. "Well, my understanding is, if [the sprinkler system] was functioning

2   properly that maybe they could have saved the hotel, which would have been very important to me,

3   very valuable to me."

4       36.    The PSE in the Policy contains a condition to coverage that requires that the

5   Insureds maintain an "Automatic Sprinkler System" at the covered property, the Planters Hotel.

6       37.    The PSE also contains an exclusion to coverage that states that Chubb Custom will

7   not pay for "loss or damage" from fire "if prior to the fire, you [the Insureds] . . .Knew of any

8   suspension or impairment in any protective safeguard listed in the Schedule above and failed to

9   notify us of that fact; or. . .*Failed to maintain any protective safeguard listed in the Schedule*

10  *above, and over which you had control, in complete working order."* (Emphasis added).

11      38.    Chubb Custom's denial of coverage for this loss is based upon the Insureds' failure

12  to maintain the automatic sprinkler system in complete working order as demonstrated by the

13  inoperability of the automatic sprinkler system in the Planters Hotel at the time of the loss. The

14  Insureds' failure to maintain the sprinkler system at the Planters Hotel in complete working order is

15  a violation of the condition section of the PSE (Section A) and falls squarely within the express

16  language of the PSE Exclusion (Section B).

17      39.    Here, there was no operational system at the time of the fire because the water to the

18  system was off at the time of the fire (as confirmed by Captain Zendejas who observed that the

19  system was not operational the day before the fire occurred).

20      40.    Facts learned in Chubb Custom's investigation show the water valve to the fire

21  suppression system was in the off position prior to the fire thus ensuring that no water would be

22  available to the system in the event of a fire and that Mr. Earley, as the Insureds' representative,

23  had control over the fire suppression system at the Hotel.

24      41.    Facts learned through Chubb Custom's investigation clearly demonstrate that the

25  Insureds also failed to maintain the fire suppression system at the insured property, the Planters

26  Hotel. Moreover, as the Insureds' representative, and as confirmed by Mr. Earley, he exercised

27  control over this system, yet failed to maintain it in complete working order; the Insureds' failure

28

1   to maintain the automatic sprinkler system in complete working order is in violation of the

2   mandates of the Protective Safeguards Endorsement in the Policy.

3         42.    All facts demonstrate that the Insureds failed to comply with the condition found

4   within the Protective Safeguards Endorsement that requires the Insureds to maintain the automatic

5   sprinkler system and all facts further demonstrate that the Insureds failed to maintain the automatic

6   sprinkler system "in complete working order," a violation that falls squarely within the exclusion

7   in the PSE. Accordingly, coverage for the fire loss to the Planters Hotel is excluded under the

8   Policy.

9                               **FIRST CLAIM FOR RELIEF**

10                        (Declaratory Relief as Against All Defendants)

11         43.    Chubb Custom hereby incorporates paragraphs 1 through 42, inclusive, as though

12   fully set forth at length herein.

13         44.    An actual controversy has arisen and now exists between Chubb Custom and

14   Defendants in that Chubb Custom contends (and Defendants dispute), that Chubb Custom has no

15   obligation to cover the loss of the Planters Hotel under its Policy. The Insured Defendants did not

16   comply with the condition to coverage mandated under Section A of the Policy's PSE when

17   Insured Defendants "failed to maintain" an operable automatic sprinkler system at the Planters

18   Hotel.

19         45.    An actual controversy has arisen and now exists between Chubb Custom and

20   Insured Defendants in that Chubb Custom contends (and Insured Defendants dispute), that Chubb

21   Custom has no obligation to cover the loss of the Planters Hotel under its Policy. The Insured

22   Defendants "failure to maintain ... in complete working order" a functional sprinkler system at the

23   Planters Hotel means that under Section B of the PSE, that coverage for the fire loss to the Planters

24   Hotel is excluded under the Policy.

25         46.    Chubb Custom desires a judicial determination of the respective rights and duties of

26   Chubb Custom with respect to coverage for the loss of the Planters Hotel under its Policy. In

27   particular, Chubb Custom desires a Declaration that, under the terms of the Policy and California

28

1  authority, Chubb Custom has no obligation to the Insured Defendants to cover the loss and damage

2  to the Planters Hotel sustained on March 7, 2007.

3       47.    Such a declaration is necessary and appropriate at this time in order that Chubb

4  Custom and its Insureds may ascertain their rights and duties under the Policy.

5                                   **PRAYER FOR RELIEF**

6       **WHEREFORE**, Plaintiff CHUBB CUSTOM INSURANCE COMPANY, prays for

7  judgment as set forth below:

8       1.    For a judicial determination of the rights and duties of the parties herein;

9       2.    For a judicial determination that coverage does not exist under the insurance policy

10  issued by Chubb Custom to the Allen Earley 1998 Family Trust, Allen Earley Planters Project LP

11  for the March 7, 2007, fire loss to the Planters Hotel;

12       3.    That Chubb Custom be awarded its costs to the extent allowed by law; and.

13       4.    That the Court award other relief as the Court deems just and proper.

14  Dated: June 17, 2008

15                              Respectfully submitted,

16                              TRESSLER, SODERSTROM, MALONEY & PRIESS, LLP

17

18                              By: _____

19                                  Paul S. White,
                                    Jeanne S. Kuo
20                                  Attorneys for Plaintiff
                                    CHUBB CUSTOM INSURANCE COMPANY

21  LA# 103577 v2 (2246-229)

22

23

24

25

26

27

28

## DEMAND FOR A JURY TRIAL

Plaintiff CHUBB CUSTOM INSURANCE COMPANY, a New Jersey corporation, hereby demands a jury trial on all issues as to which a jury is available, as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated:  June 17, 2008

Respectfully submitted,

TRESSLER, SODERSTROM, MALONEY & PRIESS, LLP

By: _____
Paul S. White
Jeanne S. Kuo
Attorneys for Plaintiff
CHUBB CUSTOM INSURANCE COMPANY

LA# 103577 v2 (2246-229)

13

Chubb Custom Insurance Company, etc. v. The Allen Earley 1998 Family Trust, etc., et al.

### Table of Content for Exhibits

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Chubb Custom Insurance Company Policy, Policy No. 79553787-00 | 00001-00066 |
| B | Fire Department Report | 00067-00072 |
| C | Captain Zendejas Report, dated April 13, 2007 | 00073-00077 |
| D | March 28, 2007 Correspondence from Douglas Huemann | 00078-00080 |
| E | Steve Sheldon Report, dated June 26, 2007 | 00081-00097 |

LA-#103586 (2246-229)



POLICY NUMBER MUST APPEAR ON ALL CORRESPONDENCE

| | Policy Number |
|---|---|
| (1) | 79553787-00 |

# Chubb Custom Insurance Company

15 Mountain View Road, Warren, NJ 07059
Please forward correspondence and claims to our Administrative Office: WKF&C Agency, Inc.

THIS IS A TRUE & CERTIFIED COPY

One Huntington Quadrangle
Suite 2C18
Melville, NY 11747

## COMMERCIAL PROPERTY POLICY
## COMMON POLICY DECLARATIONS

| POLICY PERIOD | | At 12:01 A.M. Standard Time at your Mailing Address Shown Below. | RENEWAL OF NUMBER | Account Number |
|---|---|---|---|---|
| Effective Date 08/01/2006 | Expiration Date 08/01/2007 | | | |

**NAMED INSURED AND ADDRESS**

The Allen Early 1998 Family Trust, Allen Early
Planters Project LP
2802 Winona Court
Imperial, CA 92251

**PRODUCER NAME AND ADDRESS**

M.J. Hall & Company, Inc. - Woodland Hills
5950 Canoga Avenue
Suite 530
Woodland Hills, CA 91367
Phone: 818-888-9828

**BUSINESS DESCRIPTIONS:**

NONRESIDENTIAL BUILDING OPERATORS

In return for the payment of the premium and subject to all the terms of this policy, the company indicated above agrees to provide the insurance stated in this policy.

**PREMIUM SUMMARY:**

This policy consists of the following coverage parts for which a premium is indicated. This premium may be subject to adjustment.

| | |
|---|---|
| Commercial Property Coverage Non-Terrorism Part | $7,750.00 |
| Commercial Property Coverage Terrorism Part | Not Taken |
| Commercial Inland Marine Coverage Part | $0.00 |
| Commercial Crime Coverage Part | $0.00 |
| Commerical Auto Coverage Part | $0.00 |
| Garage Coverage Part | $0.00 |

A Citizens Assessment equal to 6.84% applies to any Florida premium.    Inspection Fee    $250.00

A fee of $4.00 applies to the EMPA Trust Fund for all Florida Policies.    Policy Fee    $75.00

Minimum Earned %

TOTAL    $8,075.00

**FORM(S) AND ENDORSEMENT(S) MADE A PART OF THIS POLICY AT TIME OF ISSUE\***

*Thomas Wilson*

\*Omits applicable forms and endorsements if shown in specific Coverage Part/Coverage Form Declarations.    Authorized Signature

EXHIBIT "A"    00001

## *Insuring Agreement*

**Chubb Group of Insurance Companies**
**15 Mountain View Road**
**Warren, NJ 07059**

*Named Insured and Mailing Address*

The Allen Early 1998 Family Trust, Allen Early Planters Project LP
2802 Winona Court

Imperial, CA 92251-

*Policy Number* 79553787-00

*Effective Date* 8/1/2006

*Issued by the stock insurance company*
*indicated below, herein called the company.*

**CHUBB CUSTOM INSURANCE**
**COMPANY**
*Incorporated under the laws of Delaware.*

*Producer No.*0083535001

*Producer*
M.J. Hall & Company, Inc.
5950 Canoga Avenue Suite 530
Woodland Hills, CA 91367

### Company and Policy Period

Insurance is issued by the company in consideration of payment of the required premium.

This policy is issued for the period 12:01 AM standard time at the Named Insured's mailing address shown above:

From:  8/1/2006                    To:  8/1/2007

Your acceptance of this policy terminates, effective with the inception of this policy, any prior policy of the same number issued to you by us.

This Insuring Agreement together with the Premium Summary, Schedule Of Forms, Declarations, Contracts, Endorsements and Common Policy Conditions comprise this policy.  If this policy is a renewal, we have only reissued to you those policy documents containing changes from your previous policy period coverages and any new additional coverages or policy provisions.  All other policy documents continue in effect.

In Witness Whereof, the company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of the company.

CHUBB CUSTOM INSURANCE COMPANY (incorporated under the laws of Delaware)

President

Secretary

Authorized Representative

Form 10-02-0495 (Ed. 2-98)            Insuring Agreement                    Page 1 of 1

**EXHIBIT "A"**

00002



## Schedule of Forms

**Named Insured**  The Allen Early 1998 Family Trust, Allen Early Planters Project LP

**Policy No:**    79553787-00          Chubb Custom Insurance Company

| Form Name | Form Edition No |
|---|---|
| Declarations Page | Dec Page |
| Insuring Agreement (CCIC) | 10-02-0495 |
| Schedule of Forms | Forms |
| Location Schedule | Locsched (F1 8/95) |
| California Service of Suit | 10-02-0013 |
| Compliance with Applicable Trade Sanctions | 10-02-1562 |
| Business Income without Extra Expense | CP00320402 |
| Causes of Loss - Special Form (v. 04/02) | CP10300402 |
| Occurrence Limit of Liability | occliab(F1 2/95) |
| Commercial Property Conditions | CP00900788 |
| Building & Personal Property Form | CP00100402 |
| Common Policy Conditions | IL00171198 |
| Protective Safeguards | IL04150498 |
| OFAC Notice | 99-10-0796 |
| Civil Authority - One Mile Limit | 10-02-1563 |
| California Changes - Cancellation and Nonrenewal | IL02701104 |
| TRIA Notice | 99-10-0732 |
| Certain Computer Related Loss Exclusion | IL09350702 |
| Sprinkler Leakage Exclusion | CP10560695 |
| Asbestos Material Endorsement | asbest.mat(F1 02/95) |
| Pollution and Contamination Exclusion | pollcont.exc(F1 2/95 |
| Minimum Earned Premium | minearned.pre(F1 2/9 |
| Deductible Clause | deduct(F1 2/95) |
| Exclusion of Certified Acts and Other Acts of Terrorism; Coverage for Certain Fire Losses | IL09561102 |

# LOCATION SCHEDULE

Named Insured:    The Allen Early 1998 Family Trust, Allen Early Planters Project LP
Policy Effective Date:    07/10/2007
Policy Expiration Date:    09/13/2007
This endorsement effective:    12:01 AM  07/10/2007    forms a part of Policy No: 79553787-00

| Loc. # | Bldg. # | Location Address | Coverage | Values | Covered Cause of Loss | Co-Ins. | Value |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 101 S. Plaza Brawley, CA Imperial 92227 | REAL PROPERTY | $3,000,000 | Basic - Excluding E.Q. Sprinkler Leakage | 90% | |
| | | | RENTAL VALUE | $100,000 | Basic - Excluding E.Q. Sprinkler Leakage | 100% | |
| | | Protection: Wet-100% - Local Class: Commercial Construction: Non-Combustible | | | | | |

EXHIBIT "A"

00004

COMMERCIAL PROPERTY
CP 00 10 04 02

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section H. – Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this Section, A.1., and limited in A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

a. **Building**, meaning the building or structure described in the Declarations, including:

   (1) Completed additions;

   (2) Fixtures, including outdoor fixtures;

   (3) Permanently installed:

      (a) Machinery and

      (b) Equipment;

   (4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

      (a) Fire extinguishing equipment;

      (b) Outdoor furniture;

      (c) Floor coverings; and

      (d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

   (5) If not covered by other insurance:

      (a) Additions under construction, alterations and repairs to the building or structure;

      (b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

b. **Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property – Separation of Coverage form:

   (1) Furniture and fixtures;

   (2) Machinery and equipment;

   (3) "Stock";

   (4) All other personal property owned by you and used in your business;

   (5) Labor, materials or services furnished or arranged by you on personal property of others;

   (6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

      (a) Made a part of the building or structure you occupy but do not own; and

      (b) You acquired or made at your expense but cannot legally remove;

   (7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

© ISO Properties, Inc., 2001

EXHIBIT "A"

00005

c. **Personal Property Of Others** that is:

   (1) In your care, custody or control; and

   (2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

   However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

2. **Property Not Covered**

Covered Property does not include:

a. Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

b. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

c. Automobiles held for sale;

d. Bridges, roadways, walks, patios or other paved surfaces;

e. Contraband, or property in the course of illegal transportation or trade;

f. The cost of excavations, grading, backfilling or filling;

g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

   (1) The lowest basement floor; or

   (2) The surface of the ground, if there is no basement;

h. Land (including land on which the property is located), water, growing crops or lawns;

i. Personal property while airborne or waterborne;

j. Bulkheads, pilings, piers, wharves or docks;

k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

l. Retaining walls that are not part of a building;

m. Underground pipes, flues or drains;

n. Electronic data, except as provided under Additional Coverages – Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This Paragraph n., does not apply to your "stock" of prepackaged software.

o. The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data.

p. Vehicles or self-propelled machines (including aircraft or watercraft) that:

   (1) Are licensed for use on public roads; or

   (2) Are operated principally away from the described premises.

   This paragraph does not apply to:

   (a) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

   (b) Vehicles or self-propelled machines, other than autos you hold for sale;

   (c) Rowboats or canoes out of water at the described premises; or

   (d) Trailers, but only to the extent provided for in the Coverage Extension for Non-Owned Detached Trailers.

© ISO Properties, Inc., 2001    CP 00 10 04 02    □

EXHIBIT "A"    00006

q. The following property while outside of buildings:

   (1) Grain, hay, straw or other crops;

   (2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

**4. Additional Coverages**

   **a. Debris Removal**

   (1) Subject to Paragraphs (3) and (4), we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

   (2) Debris Removal does not apply to costs to:

      (a) Extract "pollutants" from land or water; or

      (b) Remove, restore or replace polluted land or water.

   (3) Subject to the exceptions in Paragraph (4), the following provisions apply:

      (a) The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

      (b) Subject to (a) above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

   (4) We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

      (a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

      (b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

   Therefore, if (4)(a) and/or (4)(b) apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

   (5) Examples

   The following examples assume that there is no coinsurance penalty.

**Example #1**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $ 500 |
| Amount of Loss | $ 50,000 |
| Amount of Loss Payable | $ 49,500 |
| | ($50,000 - $500) |
| Debris Removal Expense | $ 10,000 |
| Debris Removal Expense Payable | $ 10,000 |
| ($10,000 is 20% of $50,000) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph (3).

EXHIBIT "A"          00007

**Example #2**

| | | |
|---|---|---|
| Limit of Insurance | $ | 90,000 |
| Amount of Deductible | $ | 500 |
| Amount of Loss | $ | 80,000 |
| Amount of Loss Payable | $ | 79,500 |
| | ($80,000 - $500) | |
| Debris Removal Expense | $ | 30,000 |
| Debris Removal Expense Payable | | |
| Basic Amount | $ | 10,500 |
| Additional Amount | $ | 10,000 |

The basic amount payable for debris removal expense under the terms of Paragraph (3) is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph (4), because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph (4). Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

(1) While it is being moved or while temporarily stored at another location; and

(2) Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

(1) Assumed by contract or agreement prior to loss; or

(2) Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean Up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

**e. Increased Cost Of Construction**

(1) This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

(2) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in e.(3) through e.(9) of this Additional Coverage.

EXHIBIT "A"                                                                    00008

**(3)** The ordinance or law referred to in e.(2) of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of: $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced, at the same or another premises; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of e.(6) of this Additional Coverage, is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of e.(6) of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment and Valuation Conditions, and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in e.(6) of this Additional Coverage, is not subject to such limitation.

**f. Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered – Electronic Data.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage – Electronic Data, subject to the following:

**(a)** If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage – Electronic Data is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

**(b)** If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage – Electronic Data includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage – Electronic Data.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage – Electronic Data is $2,500 for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more or, a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Building, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Your Business Personal Property**

**(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

**(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions;

**(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

**(iii)** Business personal property that you newly acquire, located at the described premises.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(b)** This Extension does not apply to:

**(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

EXHIBIT "A"                                                                00010

(ii) Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

(a) This policy expires;

(b) 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

(c) You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

(1) Personal effects owned by you, your officers, your partners or members, your managers or your employees. This extension does not apply to loss or damage by theft.

(2) Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered – Electronic Data.

(2) If the Causes Of Loss – Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

(3) If the Causes Of Loss – Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

(4) Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist), and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore coverage of such costs is not additional insurance.

**d. Property Off-Premises**

(1) You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

(a) Temporarily at a location you do not own, lease or operate;

(b) In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

(c) At any fair, trade show or exhibition.

(2) This Extension does not apply to property:

(a) In or on a vehicle; or

EXHIBIT "A"                                                                          00011

**(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

**f. Non-Owned Detached Trailers**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

**(a)** The trailer is used in your business;

**(b)** The trailer is in your care, custody or control at the premises described in the Declarations; and

**(c)** You have a contractual responsibility to pay for loss or damage to the trailer.

**(2)** We will not pay for any loss or damage that occurs:

**(a)** While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

**(b)** During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

**(3)** The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes of Loss Form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

The limits applicable to the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

Payments under the Preservation of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

© ISO Properties, Inc., 2001
CP 00 10 04 02   □

EXHIBIT "A"                                                         00012

**Example No. 1:**

(This example assumes there is no coinsurance penalty.)

| | | |
|---|---|---|
| Deductible: | $ | 250 |
| Limit of Insurance – Bldg. 1: | $ | 60,000 |
| Limit of Insurance – Bldg. 2: | $ | 80,000 |
| Loss to Bldg. 1: | $ | 60,100 |
| Loss to Bldg. 2: | $ | 90,000 |

The amount of loss to Bldg. 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Bldg. 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Bldg. 1:

$ 60,100

–    250

$ 59,850 Loss Payable – Bldg. 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Bldg. 2. Loss payable for Bldg. 2 is the Limit of Insurance of $80,000.

Total amount of loss payable: $59,850 + 80,000 = $139, 850

**Example No. 2:**

(This example, too, assumes there is no coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example No. 1.

Loss to Bldg. 1:   $   70,000
(exceeds Limit of Insurance plus Deductible)

Loss to Bldg. 2:   $   90,000
(exceeds Limit of Insurance plus Deductible)

Loss Payable – Bldg. 1:    $60,000
(Limit of Insurance)

Loss Payable – Bldg. 2:    $80,000
(Limit of Insurance)

Total amount of loss payable:

$140,000

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

a. You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

EXHIBIT "A"                                                    00013

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4. **Loss Payment**

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

c. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

d. We will not pay you more than your financial interest in the Covered Property.

e. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

5. **Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

6. **Vacancy**

a. **Description Of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

© ISO Properties, Inc., 2001

CP 00 10 04 02    □ .

EXHIBIT "A"

00014



(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in b.(1)(a) through b.(1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in b., c., d. and e. below.

b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property. However, the following property will be valued at the actual cash value even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

d. Glass at the cost of replacement with safety glazing material if required by law.

e. Tenant's Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(b) Divide the amount determined in (a) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(3) Nothing if others pay for repairs or replacement.

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in Step (1);

EXHIBIT "A"                                        00015

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and

(4) Subtract the deductible from the figure determined in Step (3).

We will pay the amount determined in Step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1 (Underinsurance):**

| When: | The value of the property is | $ | 250,000 |
|---|---|---|---|
| | The Coinsurance percentage for it is | | 80% |
| | The Limit of Insurance for it is | $ | 100,000 |
| | The Deductible is | $ | 250 |
| | The amount of loss is | $ | 40,000 |

Step (1): $250,000 x 80% = $200,000
(the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000 ÷ $200,000 = .50

Step (3): $40,000 x .50 = $20,000

Step (4): $20,000 − $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2 (Adequate Insurance):**

| When: | The value of the property is | $ | 250,000 |
|---|---|---|---|
| | The Coinsurance percentage for it is | | 80% |
| | The Limit of Insurance for it is | $ | 200,000 |
| | The Deductible is | $ | 250 |
| | The amount of loss is | $ | 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

b. If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example No. 3:**

| When: | The value of property is: | | |
|---|---|---|---|
| | Bldg. at Location No. 1 | $ | 75,000 |
| | Bldg. at Location No. 2 | $ | 100,000 |
| | Personal Property at Location No. 2 | $ | 75,000 |
| | | $ | 250,000 |
| | The Coinsurance percentage for it is | | 90% |
| | The Limit of Insurance for Buildings and Personal Property at Location Nos. 1 and 2 is | $ | 180,000 |
| | The Deductible is | $ | 1,000 |
| | The amount of loss is: | | |
| | Bldg. at Location No. 2 | $ | 30,000 |
| | Personal Property at Location No. 2 | $ | 20,000 |
| | | $ | 50,000 |

Step (1): $250,000 x 90% = $225,000
(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2): $180,000 ÷ $225,000 = .80

Step (3): $50,000 x .80 = $40,000

Step (4): $40,000 − $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

2. **Mortgageholders**

a. The term mortgageholder includes trustee.

b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

(1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

(2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and



(3) Has notified us of any change in owner-ship, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

(1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgage-holder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f. If we cancel this policy, we will give written notice to the mortgageholder at least:

(1) 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. Optional Coverages**

If shown as applicable in the Declarations, the fol-lowing Optional Coverages apply separately to each item.

**1. Agreed Value**

a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that prop-erty than the proportion that the Limit of In-surance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

b. If the expiration date for this Optional Cov-erage shown in the Declarations is not ex-tended, the Additional Condition, Coinsur-ance, is reinstated and this Optional Cover-age expires.

c. The terms of this Optional Coverage apply only to loss or damage that occurs:

(1) On or after the effective date of this Optional Coverage; and

(2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

a. The Limit of Insurance for property to which this Optional Coverage applied will auto-matically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

(1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example:**

| If: | | | |
|---|---|---|---|
| | The applicable Limit of Insurance is | $ | 100,000 |
| | The annual percentage increase is | | 8% |
| | The number of days since the beginning of the policy year (or last policy change) is | | 146 |
| | The amount of increase is $100,000 x .08 x 146 ÷ 365 = | $ | 3,200 |

**3. Replacement Cost**

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Cov-erage Form.

b. This Optional Coverage does not apply to:

(1) Personal property of others;

(2) Contents of a residence;

EXHIBIT "A"                                                              00017

(3) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

(4) "Stock", unless the including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also apply:

(3) If the conditions in d.(1) and d.(2) above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost; as set forth in the Valuation Condition of this Coverage Form; and

(4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

e. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in e.(2) above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

4. Extension Of Replacement Cost To Personal Property Of Others

a. If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph 3.b.(1) of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

b. With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

H. Definitions

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

3. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

© ISO Properties, Inc., 2001

CP 00 10 04 02     □

EXHIBIT "A"

00018

COMMERCIAL PROPERTY
CP 00 32 04 02

# BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section G. – Definitions.

## A. Coverage

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

**a.** Business Income including "Rental Value".

**b.** Business Income other than "Rental Value".

**c.** "Rental Value".

If option a. above is selected, the term Business Income will include "Rental Value". If option c. above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

**a.** The portion of the building which you rent, lease or occupy; and

**b.** Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

### 2. Covered Causes Of Loss, Exclusions And Limitations

See applicable Causes of Loss Form as shown in the Declarations.

### 3. Additional Limitation – Interruption Of Computer Operations

**a.** Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage – Interruption Of Computer Operations.

**b.** Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

EXHIBIT "A"

00019

## 4. Additional Coverages

### a. Expenses To Reduce Loss

In the event of a covered loss of Business Income, we will pay necessary expenses you incur, except the cost of extinguishing a fire, to avoid further loss of Business Income. The total of our payment for Business Income loss and Expenses to Reduce Loss will not be more than the Business Income loss that would have been payable under this Coverage Form (after application of any Coinsurance penalty) if the Expenses to Reduce Loss had not been incurred. This coverage does not increase the Limit of Insurance.

The Coinsurance condition does not apply specifically to such Expenses to Reduce Loss, but it is used as described above to determine the total amount payable.

### b. Civil Authority

We will pay for the actual loss of Business Income you sustain caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. This coverage begins 72 hours after the time of that action, and will apply for a period of up to three consecutive weeks from the date on which the coverage begins.

### c. Alterations And New Buildings

We will pay for the actual loss of Business Income you sustain due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

(1) New buildings or structures, whether complete or under construction;

(2) Alterations or additions to existing buildings or structures; and

(3) Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

    (a) Used in the construction, alterations or additions; or

    (b) Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

### d. Extended Business Income

(1) **Business Income Other Than "Rental Value"**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(a) Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

(b) Ends on the earlier of:

    (i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

    (ii) 30 consecutive days after the date determined in (1)(a) above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

(2) **"Rental Value"**

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

(a) Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

(b) Ends on the earlier of:

    (i) The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

    (ii) 30 consecutive days after the date determined in (2)(a) above.

© ISO Properties, Inc., 2001

CP 00 32 04 02     ❑

**EXHIBIT "A"**

00020

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

e. **Interruption Of Computer Operations**

(1) Under this Additional Coverage, electronic data has the meaning described under Additional Limitation – Interruption Of Computer Operations.

(2) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss.

(3) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

(a) If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage – Interruption Of Computer Operations is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

(b) If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage – Interruption Of Computer Operations includes Collapse as set forth in that form.

(c) If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage – Interruption Of Computer Operations.

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage – Interruption Of Computer Operations is $2,500 for all loss sustained in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss sustained as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss in a subsequent policy year(s), all loss is deemed to be sustained in the policy year in which the interruption began.

(5) This Additional Coverage – Interruption in Computer Operations does not apply to loss sustained after the end of the "period of restoration", even if the amount of insurance stated in (4) above has not been exhausted.

5. **Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**NEWLY ACQUIRED LOCATIONS**

a. You may extend your Business Income Coverage to apply to property at any location you acquire other than fairs or exhibitions.

b. The most we will pay for loss under this Extension is $100,000 at each location.

EXHIBIT "A"                                                     00021

c. Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

(1) This policy expires;

(2) 30 days expire after you acquire or begin to construct the property; or

(3) You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

This Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

## B. Limits Of Insurance

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The limit applicable to the Coverage Extension is in addition to the Limit of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

1. Alterations and New Buildings;

2. Civil Authority;

3. Extended Business Income;

4. Expenses to Reduce Loss.

## C. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

## 2. Duties In The Event Of Loss

a. You must see that the following are done in the event of loss:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(7) Cooperate with us in the investigation or settlement of the claim.

(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

### 3. Loss Determination

a. The amount of Business Income loss will be determined based on:

(1) The Net Income of the business before the direct physical loss or damage occurred;

(2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4) Other relevant sources of information, including:

(a) Your financial records and accounting procedures;

(b) Bills, invoices and other vouchers; and

(c) Deeds, liens or contracts.

b. **Resumption Of Operations**

We will reduce the amount of your Business Income loss to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

c. If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

### 4. Loss Payment

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

a. We have reached agreement with you on the amount of loss; or

b. An appraisal award has been made.

### D. Additional Condition

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any loss if the Limit of Insurance for Business Income is less than:

a. The Coinsurance percentage shown for Business Income in the Declarations; times

b. The sum of:

(1) The Net Income (Net Profit or Loss before income taxes), and

(2) Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

1. Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

2. Divide the Limit of Insurance for the described premises by the figure determined in Step 1; and

3. Multiply the total amount of loss by the figure determined in Step 2.

We will pay the amount determined in Step 3 or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

1. Prepaid freight – outgoing;

2. Returns and allowances;

3. Discounts;

4. Bad debts;

5. Collection expenses;

6. Cost of raw stock and factory supplies consumed (including transportation charges);

7. Cost of merchandise sold (including transportation charges);

8. Cost of other supplies consumed (including transportation charges);

9. Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

EXHIBIT "A"                                    00023

10. Power, heat and refrigeration expenses that do not continue under contract (if Form CP 15 11 is attached);

11. All ordinary payroll expenses or the amount of payroll expense excluded (if Form CP 15 10 is attached); and

12. Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion -- not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example No. 1 (Underinsurance):**

| When: | The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been $400,000 | |
|---|---|---|
| | The Coinsurance percentage is | 50% |
| | The Limit of Insurance is | $150,000 |
| | The amount of loss is | $ 80,000 |
| Step 1: | $400,000 x 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements) | |
| Step 2: | $150,000 + $200,000 = .75 | |
| Step 3: | $ 80,000 x .75 = $60,000 | |

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example No. 2 (Adequate Insurance):**

| When: | The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been $400,000 | |
|---|---|---|
| | The Coinsurance percentage is | 50% |
| | The Limit of Insurance is | $200,000 |
| | The amount of loss is | $ 80,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

**E. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

1. **Maximum Period Of Indemnity**

   a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

   b. The most we will pay for loss of Business Income is the lesser of:

      (1) The amount of loss sustained during the 120 days immediately following the beginning of the "period of restoration"; or

      (2) The Limit of Insurance shown in the Declarations.

2. **Monthly Limit Of Indemnity**

   a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

   b. The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

      (1) The Limit of Insurance, multiplied by

      (2) The fraction shown in the Declarations for this Optional Coverage.

**Example**

| When: | The Limit of Insurance is | $120,000 |
|---|---|---|
| | The fraction shown in the Declarations for this Optional Coverage is | 1/4 |

The most we will pay for loss in each period of 30 consecutive days is:

$120,000 x 1/4 = $30,000

If, in this example, the actual amount of loss is:

| | |
|---|---|
| Days 1-30 | $40,000 |
| Days 31-60 | 20,000 |
| Days 61-90 | 30,000 |
| | $90,000 |

We will pay:

| | |
|---|---|
| Days 1-30 | $30,000 |
| Days 31-60 | 20,000 |
| Days 61-90 | 30,000 |
| | $80,000 |

The remaining $10,000 is not covered.

3. **Business Income Agreed Value**

   a. To activate this Optional Coverage:

      (1) A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

EXHIBIT "A"                                                                 00024

(a) During the 12 months prior to the date of the Work Sheet; and

(b) Estimated for the 12 months immediately following the inception of this Optional Coverage.

(2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

(a) The Coinsurance percentage shown in the Declarations; multiplied by

(b) The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

b. The Additional Condition, Coinsurance, is suspended until:

(1) 12 months after the effective date of this Optional Coverage; or

(2) The expiration date of this policy;

whichever occurs first.

c. We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

(1) Within 12 months of the effective date of this Optional Coverage; or

(2) When you request a change in your Business Income Limit of Insurance.

d. If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

(1) The Business Income Limit of Insurance; divided by

(2) The Agreed Value.

**Example**

When:      The Limit of Insurance is        $100,000
           The Agreed Value is              $200,000
           The amount of loss is             $80,000

Step (a):  $100,000 + $200,000 = .50

Step (b):  .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

4. **Extended Period Of Indemnity**

Under Paragraph A.4.d., Extended Business Income, the number "30" in Subparagraphs (1)(b) and (2)(b) is replaced by the number shown in the Declarations for this Optional Coverage.

F. **Definitions**

1. "Finished Stock" means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

2. "Operations" means:

a. Your business activities occurring at the described premises; and

b. The tenantability of the described premises, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

3. "Period of Restoration" means the period of time that:

a. Begins 72 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the earlier of:

(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

(1) Regulates the construction, use or repair, or required the tearing down of any property; or

(2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

  © ISO Properties, Inc., 2001

EXHIBIT "A"                                                                 00025

4. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

5. "Rental Value" means Business Income that consists of:

   a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

   b. Continuing normal operating expenses incurred in connection with that premises, including:

      (1) Payroll; and

      (2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

6. "Suspension" means:

   a. The slowdown or cessation of your business activities; or

   b. That a part or all of the described premises is rendered untenantable, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

© ISO Properties, Inc., 2001

CP 00 32 04 02

EXHIBIT "A"

00026

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at anytime;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98            Copyright, Insurance Services Office, Inc., 1998            Page 1 of 1            □

EXHIBIT "A"                                                            00027

COMMERCIAL PROPERTY
CP 10 30 04 02

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section F. – Definitions.

## A. Covered Causes Of Loss

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

**1.** Excluded in Section B., Exclusions; or

**2.** Limited in Section C., Limitations;

that follow.

## B. Exclusions

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Ordinance Or Law**

The enforcement of any ordinance or law:

**(1)** Regulating the construction, use or repair of any property; or

**(2)** Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance Or Law, applies whether the loss results from:

**(1)** An ordinance or law that is enforced even if the property has not been damaged; or

**(2)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

**(1)** Earthquake, including any earth sinking, rising or shifting related to such event;

**(2)** Landslide, including any earth sinking, rising or shifting related to such event;

**(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in b.(1) through (4) above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust or particulate matter; or

**(c)** Lava flow.

All volcanic eruptions that occur within any 168 hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

© ISO Properties, Inc., 2001

EXHIBIT "A"

00028



**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises. Failure includes lack of sufficient capacity and reduction in supply.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion does not apply to the Business Income coverage or to Extra Expense coverage. Instead, the Special Exclusion in Paragraph B.4.a.(1) applies to these coverages.

**f. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if Water, as described in g.(1) through g.(4) above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

1. When "fungus", wet or dry rot or bacteria results from fire or lightning; or

2. To the extent that coverage is provided in the Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions B.1.a. through B.1.h. apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from any of the following:

a. Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

b. Delay, loss of use or loss of market.

c. Smoke, vapor or gas from agricultural smudging or industrial operations.

d.(1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

© ISO Properties, Inc., 2001    CP 10 30 04 02    ☐

EXHIBIT "A"

00029

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

  **(a)** Dampness or dryness of atmosphere;

  **(b)** Changes in or extremes of temperature; or

  **(c)** Marring or scratching.

But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

  **(1)** You do your best to maintain heat in the building or structure; or

  **(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

  **(1)** Acting alone or in collusion with others; or

  **(2)** Whether or not occurring during the hours of employment.

  This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, except as provided below in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

  This exclusion, l., does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

EXHIBIT "A"                    00030

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property on or off the described premises.

4. **Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

a. **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

(1) Any loss caused directly or indirectly by the failure of power or other utility service supplied to the described premises, however caused, if the failure occurs outside of a covered building. Failure includes lack of sufficient capacity and reduction in supply.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss resulting from that Covered Cause of Loss.

(2) Any loss caused by or resulting from:

(a) Damage or destruction of "finished stock"; or

(b) The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

(3) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

(4) Any increase of loss caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

(5) Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

(6) Any other consequential loss.

b. **Leasehold Interest Coverage Form**

(1) Paragraph B.1.a. Ordinance Or Law, does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

(a) Your cancelling the lease;

(b) The suspension, lapse or cancellation of any license; or

(c) Any other consequential loss.

c. **Legal Liability Coverage Form**

(1) The following exclusions do not apply to insurance under this Coverage Form:

(a) Paragraph B.1.a., Ordinance Or Law;

(b) Paragraph B.1.c., Governmental Action;

(c) Paragraph B.1.d., Nuclear Hazard;

(d) Paragraph B.1.e., Utility Services; and

(e) Paragraph B.1.f., War And Military Action.

© ISO Properties, Inc., 2001

CP 10 30 04 02    □

EXHIBIT "A"

00031



**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

**a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**d.** Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

However, this limitation does not apply to:

**(1)** Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

**(2)** Business income coverage or Extra Expense coverage.

**e.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

**f.** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

**2.** We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

**a.** Animals, and then only if they are killed or their destruction is made necessary.

**b.** Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

**(1)** Glass; or

**(2)** Containers of property held for sale.

**c.** Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.



However, this limitation does not apply:

(1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

(2) To Business Income coverage or to Extra Expense coverage.

3. The special limit shown for each category, a. through d., is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

a. $2,500 for furs, fur garments and garments trimmed with fur.

b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

c. $2,500 for patterns, dies, molds and forms.

d. $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, C.3., does not apply to Business Income coverage or to Extra Expense coverage.

4. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

a. Results in discharge of any substance from an automatic fire protection system; or

b. Is directly caused by freezing.

However, this limitation does not apply to Business Income coverage or to Extra Expense coverage.

D. Additional Coverage – Collapse

The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in D.1. through D.5. below.

1. With respect to buildings:

a. Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;

b. A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

c. A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;

d. A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

2. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if the collapse is caused by one or more of the following:

a. The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

b. Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

c. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

d. Weight of people or personal property;

e. Weight of rain that collects on a roof;

EXHIBIT "A"

00033

f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in 2.a. through 2.e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

The criteria set forth in 1.a. through 1.d. do not limit the coverage otherwise provided under this Causes of Loss Form for the causes of loss listed in 2.a., 2.d. and 2.e.

3. With respect to the following property:

a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

b. Awnings, gutters and downspouts;

c. Yard fixtures;

d. Outdoor swimming pools;

e. Fences;

f. Piers, wharves and docks;

g. Beach or diving platforms or appurtenances;

h. Retaining walls; and

i. Walks, roadways and other paved surfaces;

if the collapse is caused by a cause of loss listed in 2.b. through 2.f., we will pay for loss or damage to that property only if:

a. Such loss or damage is a direct result of the collapse of a building insured under this Coverage Form; and

b. The property is Covered Property under this Coverage Form.

4. If personal property abruptly falls down or caves in and such collapse is not the result of collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

a. The collapse was caused by a Cause of Loss listed in 2.a. through 2.f. above;

b. The personal property which collapses is inside a building; and

c. The property which collapses is not of a kind listed in 3. above, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph 4. does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

Collapse of personal property does not mean cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

5. This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

E. Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria

1. The coverage described in E.2. and E.6. only applies when the "fungus", wet or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

a. A "specified cause of loss" other than fire or lightning; or

b. Flood, if the Flood Coverage Endorsement applies to the affected premises.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under E.2. of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

EXHIBIT "A"                                                                          00034



4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph F.2. (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss Form or under the Additional Coverage – Collapse.

6. The following, 6.a. or 6.b., applies only if Business Income and/or Extra Expense coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense coverage form.

   a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

   b. If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

F. Additional Coverage Extensions

1. Property In Transit

   This Extension applies only to your personal property to which this form applies.

   a. You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

   b. Loss or damage must be caused by or result from one of the following causes of loss:

      (1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

      (2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed.

      (3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

   c. The most we will pay for loss or damage under this Extension is $5,000.

   This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2. Water Damage, Other Liquids, Powder Or Molten Material Damage

   If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

3. Glass

   a. We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

© ISO Properties, Inc., 2001

CP 10 30 04 02    □

EXHIBIT "A"

b. We will pay for expenses incurred to re-move or replace obstructions when repair-ing or replacing glass that is part of a build-ing. This does not include removing or re-placing window displays.

This Coverage Extension, F.3., does not in-crease the Limit of Insurance.

## G. Definitions

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or re-leased by fungi.

2. "Specified Causes of Loss" means the follow-ing: Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commo-tion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   a. Sinkhole collapse means the sudden sink-ing or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   (1) The cost of filling sinkholes; or

   (2) Sinking or collapse of land into man-made underground cavities.

   b. Falling objects does not include loss or damage to:

   (1) Personal property in the open; or

   (2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

   c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

CP 10 30 04 02                     © ISO Properties, Inc., 2001                     Page 9 of 9     □

EXHIBIT "A"

00036

COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and

2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

1. We cover loss or damage commencing:

   a. During the policy period shown in the Declarations; and

   b. Within the coverage territory.

2. The coverage territory is:

   a. The United States of America (including its territories and possessions);

   b. Puerto Rico; and

   c. Canada.

EXHIBIT "A"    00037

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance;

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you; or

   c. Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987
CP 00 90 07 88

EXHIBIT "A"

00038

IL 09 35 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY

A. We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

1. The failure, malfunction or inadequacy of:

a. Any of the following, whether belonging to any insured or to others:

(1) Computer hardware, including microprocessors;

(2) Computer application software;

(3) Computer operating systems and related software;

(4) Computer networks;

(5) Microprocessors (computer chips) not part of any computer system; or

(6) Any other computerized or electronic equipment or components; or

b. Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph A.1.a. of this endorsement;

due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

2. Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph A.1. of this endorsement.

B. If an excluded Cause of Loss as described in Paragraph A. of this endorsement results:

1. In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

2. Under the Commercial Property Coverage Part:

a. In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss – Special Form; or

b. In a Covered Cause of Loss under the Causes Of Loss – Basic Form or the Causes Of Loss – Broad Form;

we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

C. We will not pay for repair, replacement or modification of any items in Paragraphs A.1.a. and A.1.b. of this endorsement to correct any deficiencies or change any features.

EXHIBIT "A"                                              00039

# ENDORSEMENT

| | |
|---|---|
| *Policy Period* | To     8/1/2007 |
| *Effective Date* | 8/1/2006 |
| *Policy Number* | 79553787-00 |
| *Insured LP* | The Allen Early 1998 Family Trust, Allen Early Planters Project |
| *Name of Company* | Chubb Custom Insurance Company |
| *Date Issued* | 8/9/2006 |

**California Service Of Suit Conditions**

**UNDER CONDITIONS, THE FOLLOWING CONDITION IS ADDED:**

In the event we fail to pay any amount claimed to be due under this insurance, at your request we will submit to the jurisdiction of a court of competent jurisdiction within the United States of America. Nothing in this condition constitutes or should be understood to constitute a waiver of our rights to commence an action in a court of competent jurisdiction in the United States or to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Service of process in such suit may be made upon James V. Lalor, 801 S. Figueroa Street, Suite 2400, Los Angeles, CA 90017-5556, or his nominee, and that in any suit instituted against any one of them upon this policy, we will abide by the final decision of court or of any appellate court in the event of an appeal.

The above named is authorized and directed to accept service of process on our behalf in any such suit and/or your request to give you a written undertaking that it or we will enter a general appearance in the event such a suit shall be instituted.

In accordance with any statute of any state, territory or district of the United States of America, which makes provision therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance, Secretary of State or other officer or officers specified for that purpose in the statute or his or their successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on your behalf or the behalf of any beneficiary arising out of this contract of insurance, and hereby designate James V. Lalor, or his nominee, as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions remain unchanged.

*signature: A. Robert Hamburger*

Form 10-02-0013C (Ed. 2-98)          Endorsement          Page 1 of 1

EXHIBIT "A"          00040

IL 02 70 11 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART

**A.** Paragraphs **2.** and **3.** of the **Cancellation** Common Policy Condition are replaced by the following:

**2. All Policies In Effect For 60 Days Or Less**

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

**a.** 10 days before the effective date of cancellation if we cancel for:

**(1)** Nonpayment of premium; or

**(2)** Discovery of fraud by:

**(a)** Any insured or his or her representative in obtaining this insurance; or

**(b)** You or your representative in pursuing a claim under this policy.

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3. All Policies In Effect For More Than 60 Days**

**a.** If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

**(1)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

**(2)** Discovery of fraud or material misrepresentation by:

**(a)** Any insured or his or her representative in obtaining this insurance; or

**(b)** You or your representative in pursuing a claim under this policy.

**(3)** A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

IL 02 70 11 04                © ISO Properties, Inc., 2004                Page 1 of 4    □

EXHIBIT "A"

00041

**(4)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

**(5)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(6)** A determination by the Commissioner of Insurance that the:

**(a)** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

**(b)** Continuation of the policy coverage would:

**(i)** Place us in violation of California law or the laws of the state where we are domiciled; or

**(ii)** Threaten our solvency.

**(7)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

**b.** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph 3.a.

**B.** The following provision is added to the **Cancellation** Common Policy Condition:

**7. Residential Property**

This provision applies to coverage on real property which is used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household personal property in a residential unit, if such coverage is written under one of the following:

Commercial Property Coverage Part

Farm Coverage Part – Farm Property – Farm Dwellings, Appurtenant Structures And Household Personal Property Coverage Form

**a.** If such coverage has been in effect for 60 days or less, and is not a renewal of coverage we previously issued, we may cancel this coverage for any reason, except as provided in b. and c. below.

**b.** We may not cancel this policy solely because the first Named Insured has:

**(1)** Accepted an offer of earthquake coverage; or

**(2)** Cancelled or did not renew a policy issued by the California Earthquake Authority (CEA) that included an earthquake policy premium surcharge.

However, we shall cancel this policy if the first Named Insured has accepted a new or renewal policy issued by the CEA that includes an earthquake policy premium surcharge but fails to pay the earthquake policy premium surcharge authorized by the CEA.

**c.** We may not cancel such coverage solely because corrosive soil conditions exist on the premises. This Restriction (c.) applies only if coverage is subject to one of the following, which exclude loss or damage caused by or resulting from corrosive soil conditions:

**(1)** Capital Assets Program Coverage Form (Output Policy);

**(2)** Commercial Property Coverage Part – Causes Of Loss – Special Form; or

**(3)** Farm Coverage Part – Causes Of Loss Form – Farm Property, Paragraph D. Covered Causes Of Loss – Special.

© ISO Properties, Inc., 2004   IL 02 70 11 04   □

EXHIBIT "A"   00042



C. The following is added and supersedes any provisions to the contrary:

**NONRENEWAL**

1. Subject to the provisions of Paragraphs C.2. and C.3. below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

    We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

2. **Residential Property**

    This provision applies to coverage on real property used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household property contained in a residential unit, if such coverage is written under one of the following:

    Capital Assets Program (Output Policy) Coverage Part

    Commercial Property Coverage Part

    Farm Coverage Part – Farm Property – Farm Dwellings, Appurtenant Structures And Household Personal Property Coverage Form

    a. We may elect not to renew such coverage for any reason, except as provided in b., c. and d. below.

    b. We will not refuse to renew such coverage solely because the first Named Insured has accepted an offer of earthquake coverage.

       However, the following applies only to insurers who are associate participating insurers as established by Cal. Ins. Code Section 10089.16. We may elect not to renew such coverage after the first Named Insured has accepted an offer of earthquake coverage, if one or more of the following reasons applies:

       (1) The nonrenewal is based on sound underwriting principles that relate to the coverages provided by this policy and that are consistent with the approved rating plan and related documents filed with the Department of Insurance as required by existing law;

       (2) The Commissioner of Insurance finds that the exposure to potential losses will threaten our solvency or place us in a hazardous condition. A hazardous condition includes, but is not limited to, a condition in which we make claims payments for losses resulting from an earthquake that occurred within the preceding two years and that required a reduction in policyholder surplus of at least 25% for payment of those claims; or

       (3) We have:

           (a) Lost or experienced a substantial reduction in the availability or scope of reinsurance coverage; or

           (b) Experienced a substantial increase in the premium charged for reinsurance coverage of our residential property insurance policies; and

           the Commissioner has approved a plan for the nonrenewals that is fair and equitable, and that is responsive to the changes in our reinsurance position.

    c. We will not refuse to renew such coverage solely because the first Named Insured has cancelled or did not renew a policy, issued by the California Earthquake Authority that included an earthquake policy premium surcharge.

    d. We will not refuse to renew such coverage solely because corrosive soil conditions exist on the premises. This Restriction (d.) applies only if coverage is subject to one of the following, which exclude loss or damage caused by or resulting from corrosive soil conditions:

       (1) Capital Assets Program Coverage Form (Output Policy);

       (2) Commercial Property Coverage Part – Causes Of Loss – Special Form; or

       (3) Farm Coverage Part – Causes Of Loss Form – Farm Property, Paragraph D. Covered Causes Of Loss – Special.

3. We are not required to send notice of nonrenewal in the following situations:

    a. If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

b. If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph C.1.

c. If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

d. If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

e. If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

f. If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph C.1., to re-new the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

© ISO Properties, Inc., 2004

**IL 02 70 11 04**    ☐

**EXHIBIT "A"**

00044

COMMERCIAL PROPERTY
CP 10 56 06 95

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SPRINKLER LEAKAGE EXCLUSION

This endorsement modifies insurance provided under the following:

CAUSES OF LOSS – BASIC FORM
CAUSES OF LOSS – BROAD FORM
CAUSES OF LOSS – SPECIAL FORM

**A.** The following is added to the EXCLUSIONS section and is therefore not a Covered Cause of Loss:

**SPRINKLER LEAKAGE**

Sprinkler Leakage, meaning leakage or discharge of any substance from an Automatic Sprinkler System, including collapse of a tank that is part of the system.

But if Sprinkler Leakage results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**B.** Under EXCLUSION 1.g., Water, the last paragraph is replaced by the following:

But if Water, as described in g.(1) through (4), results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**C.** EXCLUSIONS 2.b. and 2.c. in the Causes of Loss – Basic Form are replaced by the following:

We will not pay for loss or damage caused by or resulting from:

**b.** Rupture or bursting of water pipes unless caused by a Covered Cause of Loss.

**c.** Leakage or discharge of water or steam from any part of a system or appliance containing water or steam, unless the leakage or discharge occurs because the system or appliance was damaged by a Covered Cause of Loss.

**D.** Under ADDITIONAL COVERAGE – COLLAPSE, in the Causes of Loss – Broad Form, leakage from fire extinguishing equipment is deleted from paragraph 1.a.(1).

**E.** EXCLUSION 2.g., in the Causes of Loss – Special Form, is replaced by the following:

We will not pay for loss or damage caused by or resulting from water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

**F.** Under LIMITATIONS in the Causes of Loss – Special Form, item 5. is replaced by the following:

**5.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if:

**a.** The damage is directly caused by freezing; and

**b.** You do your best to maintain heat in the building or structure, or you drain the equipment and shut off the supply if the heat is not maintained.

However, this limitation does not apply to Business Income coverage or to Extra Expense coverage.

**G.** In the Causes of Loss – Special Form, leakage from fire extinguishing equipment is deleted from the "specified causes of loss".

EXHIBIT "A"

00045

POLICY NUMBER: 79553787-00                          FORM 10-02-1562 (Ed. 02-05)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## COMPLIANCE WITH APPLICABLE TRADE SANCTIONS ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMON POLICY CONDITIONS

**The following is added:**

**Compliance With Applicable Trade Sanctions**

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance.

FORM 10-02-1562 (Ed. 02-05)                              Page 1  of 1

EXHIBIT "A"                                    00046

POLICY NUMBER: 79553787-00

COMMERCIAL PROPERTY
FORM 10-02-1563 (Ed. 02-05)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CIVIL AUTHORITY – ONE MILE LIMIT

This endorsement modifies insurance provided under the following:

BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM
EXTRA EXPENSE COVERAGE FORM

1. In BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM, the Additional Coverage, Civil Authority is deleted and replaced by the following:

   **a. Civil Authority**

   We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than property at the described premises, caused by or resulting from any Covered Cause of Loss, provided such property is within one mile of such premises.

   The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

   The coverage for Extra Expense will begin immediately after the time of that action and will end:

   (1) 3 consecutive weeks after the time of that action; or

   (2) When your Business Income coverage ends;

   whichever is later.

2. In BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM, the Additional Coverage, Civil Authority is deleted and replaced by the following:

   **b. Civil Authority**

   We will pay for the actual loss of Business Income you sustain caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, other than property at the described premises, caused by or resulting from any Covered Cause of Loss, provided such property is within one mile of such premises. This coverage begins 72 hours after the time of that action, and will apply for a period of up to three consecutive weeks from the date on which the coverage begins.

3. In EXTRA EXPENSE COVERAGE FORM, the Additional Coverage, Civil Authority is deleted and replaced by the following:

   **b.    Civil Authority**

   We will pay for the actual and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, other than property at the described premises, caused by or resulting from any Covered Cause of Loss, provided such property is within one mile of such premises. This coverage will apply for a period of up to three consecutive weeks from the date of that action.

FORM 10-02-1563 (Ed. 02-05)                                    Page 1 of 1
         Includes copyrighted material of Insurance Services Office, Inc., with its permission

EXHIBIT "A"

## IMPORTANT NOTICE TO POLICYHOLDERS

**This Important Notice is not your policy. Please read your policy carefully to determine your rights, duties, and what is and what is not covered. Only the provisions of your policy determine the scope of your insurance protection.**

**THIS IMPORTANT NOTICE PROVIDES INFORMATION CONCERNING POSSIBLE IMPACT ON YOUR INSURANCE COVERAGE DUE TO COMPLIANCE WITH APPLICABLE TRADE SANCTION LAWS.**

**PLEASE READ THIS NOTICE CAREFULLY.**

Various trade or economic sanctions and other laws or regulations prohibit us from providing insurance in certain circumstances. For example, the United States Treasury Department's Office of Foreign Asset Control (OFAC) administers and enforces economic and trade sanctions and places restrictions on transactions with foreign agents, front organizations, terrorists, terrorists organizations, and narcotic traffickers. OFAC acts pursuant to Executive Orders of the President of the United States and specific legislation, to impose controls on transactions and freeze foreign assets under United States jurisdiction. (To learn more about OFAC, please refer to the United States Treasury's web site at http://www.treas.gov/ofac.)

To the extent that you or any other insured, or any person or entity claiming the benefits of this insurance has violated any applicable sanction laws, this insurance will not apply.

EXHIBIT "A"                                                                    00048

# IMPORTANT NOTICE TO POLICYHOLDERS

## *TERRORISM RISK INSURANCE ACT OF 2002*

This Important Notice is being provided with your policy to further satisfy the disclosure requirements of the Terrorism Risk Insurance Act of 2002 ("TRIA").

At the time you received the written offer for this policy, we provided you with an Important Notice to Policyholders indicating that the insurance provided in your policy for losses caused by certain acts of terrorism (as defined in TRIA) would be partially reimbursed by the United States of America, pursuant to the formula set forth in TRIA. In addition, as required by TRIA, we:

- indicated that we would make available insurance for such losses in the same manner as we provide insurance for other types of losses;

- specified the premium we would charge, if any, for providing such insurance; and

- except to the extent prohibited by law, gave you the opportunity to reject such insurance and have a terrorism exclusion, sublimit or other limitation included in your policy.

This Important Notice refers back to that Important Notice and provides information about your decision and the manner in which your policy has been subsequently modified.

If:

- You rejected terrorism insurance under TRIA, your policy includes the appropriate amendatory endorsement(s).

- You did not reject terrorism insurance under TRIA, the premium charged for your policy, including that portion applicable to terrorism insurance under TRIA, is shown in your policy. To the extent your policy includes a limitation on terrorism insurance, it has been modified so that such limitation does not apply to terrorism insurance under TRIA.

Please carefully review your policy and the Important Notice previously provided to you for further details. Please remember that only the terms of your policy establish the scope of your insurance protection.

**Please note that if your policy:**

- *provides commercial property insurance in a jurisdiction that has a statutory standard fire policy, the premium we charge for terrorism insurance under TRIA, includes an amount attributable to the insurance provided pursuant to that standard fire policy. Rejection of such statutory insurance is legally prohibited.*

- *is a workers compensation policy, rejection of insurance for terrorism is legally prohibited.*

EXHIBIT "A"                                                              00049

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

### SCHEDULE*

| | Prem. No. | Bldg. No. | Protective Safeguards Symbols Applicable |
|---|---|---|---|
| | 1 | 1 | P-1 |

Describe any "P-9":

* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A.** The following is added to the:

Commercial Property Conditions
General Conditions in the     Farm Property –
Other Farm
        Provisions Form – Additional Coverages,
        Conditions, Definitions
General Conditions in the Mobile Agricultural
Machinery and Equipment Coverage Form
General Conditions in the Livestock Coverage
Form

#### PROTECTIVE SAFEGUARDS

1.  As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

2.  The protective safeguards to which this endorsement applies are identified by the following symbols:

    **"P-1"   Automatic Sprinkler System,** including related supervisory services.

    Automatic Sprinkler System means:

    a. Any automatic fire protective or extinguishing system, including connected:

    (1) Sprinklers and discharge nozzles;

    (2) Ducts, pipes, valves and fittings;

    (3) Tanks, their component parts and supports; and

    (4) Pumps and private fire protection mains.

    b. When supplied from an automatic fire protective system:

    (1) Non-automatic fire protective systems; and

    (2) Hydrants, standpipes and outlets.

    **"P-2" Automatic Fire Alarm,** protecting the entire building, that is:

    a. Connected to a central station; or

    b. Reporting to a public or private fire alarm station.

    **"P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

    **"P-4" Service Contract** with a privately owned fire department providing fire protection service to the described premises.

    **"P-9"** The protective system described in the Schedule.

IL 04 15 04 98          Copyright, Insurance Services Office, Inc., 1997          Page 1 of 2

3. The following is added to the EXCLUSIONS section of:

CAUSES OF LOSS – BASIC FORMCAUSES OF LOSS – BROAD FORM
CAUSES OF LOSS – SPECIAL FORM
MORTGAGE HOLDERS ERRORS AND OMISSIONS COVERAGE FORM
STANDARD PROPERTY POLICY
CAUSES OF LOSS FORM – FARM PROPERTY
MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM
LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

1. Knew of any suspension orimpairment in any protective safeguardlisted in the Schedule above and failed tonotify us of that fact; or

2. Failed to maintain any protectivesafeguard listed in the Schedule above, andover which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

Copyright, Insurance Services Office, Inc., 1997
IL 04 15 04 98

EXHIBIT "A"

00051

IL 09 56 11 02

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS AND OTHER ACTS OF TERRORISM; COVERAGE FOR CERTAIN FIRE LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

A. The following definitions are added with respect to the provisions of this endorsement:

1. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in that Act for a "certified act of terrorism" include the following:

   a. The act resulted in aggregate losses in excess of $5 million; and

   b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

2. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act of 2002.

B. The following exclusion is added:

## EXCLUSION OF CERTIFIED ACTS AND OTHER ACTS OF TERRORISM

We will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism" or an "other act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. But with respect to an "other act of terrorism", this exclusion applies only when one or more of the following are attributed to such act:

1. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

2. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

3. The total of insured damage to all types of property in the United States, its territories and possessions, Puerto Rico and Canada exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions. Multiple incidents of "other acts of terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident.

© ISO Properties, Inc., 2002

EXHIBIT "A"    00052

With respect to this Item **B.3.**, the immediately preceding paragraph describes the threshold used to measure the magnitude of an "other act of terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this exclusion will apply to that incident. When the exclusion applies to an "other act of terrorism", there is no coverage under this Coverage Part or Standard Property Policy.

## C. Exception Covering Certain Fire Losses

If a "certified act of terrorism" or an "other act of terrorism" results in fire, we will pay for the loss or damage caused by that fire. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements which apply to those forms, or to the Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

With respect to fire resulting from any one or more "certified acts of terrorism" under the federal Terrorism Risk Insurance Act of 2002, we will not pay any amounts for which we are not responsible under the terms of that Act (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

## D. Application Of Other Exclusions

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Standard Property Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

© ISO Properties, Inc., 2002

IL 09 56 11 02    ☐

EXHIBIT "A"

00053



Named Insured: The Allen Early 1998 Family Trust, Allen Early Planters Project LP

Policy Effective Date: 8/1/2006
Policy Expiration Date: 8/1/2007

This endorsement effective: 8/1/2006    forms a part of
Policy No: 79553787-00    issued on behalf of: Chubb Custom Insurance Company

## POLLUTION AND CONTAMINATION EXCLUSION

This policy does not cover loss or damage to property covered caused directly or indirectly by the release or discharge or dispersal of toxic or hazardous substances, contaminants or pollutants. Nor will we cover the cost of removal, disposal, decontamination or replacement of insured property which has been contaminated by toxic or hazardous substances, contaminants or pollutants and which by law or civil authority must be restored, disposed of or decontaminated. Such loss to property covered is excluded regardless of any other clause or event that contributes concurrently or in any sequence to the loss. If loss otherwise covered by this policy occurs and the cost of removal of debris is increased due to the presence of toxic or hazardous substances, contaminants, or pollutants, this policy will only be liable for the cost of debris removal which would have been incurred had no toxic or hazardous substances, contaminants or pollutants been present in, on or about the covered property to be removed.

All other terms and conditions of this policy remain unchanged.

pollcont.exc(F1) 2/95

EXHIBIT "A"    00054

Named Insured: The Allen Early 1998 Family Trust, Allen Early Planters Project LP

Policy Effective Date: 8/1/2006
Policy Expiration Date: 8/1/2007

This endorsement effective: 8/1/2006     forms a part of
Policy No: 79553787-00     issued on behalf of: Chubb Custom Insurance Company

## <u>DEDUCTIBLE CLAUSE</u>

Each Claim for loss or damage shall be adjusted separately and from the amount of such adjusted claim there shall be deducted the sum of $2,500.00 Any salvage or other recovery (after expenses incurred in salvage or recovery are deducted) except recovery through subrogation proceedings shall accrue entirely to the benefit of this Company until the sum paid by this Company has been recovered.

All other terms and conditions of this policy remain unchanged.

deduct(f1)2/95

EXHIBIT "A"                                                                           00055



Named Insured: The Allen Early 1998 Family Trust, Allen Early Planters Project LP

Policy Effective Date: 8/1/2006
Policy Expiration Date: 8/1/2007

This endorsement effective: 8/1/2006      forms a part of
Policy No: 79553787-00    issued on behalf of: Chubb Custom Insurance Company

### MINIMUM EARNED PREMIUM

In the event of cancellation of this policy by the Insured, a minimum of  of the total policy premium shall become earned.  Any condition(s) of the policy notwithstanding.

Failure of the Insured to make timely payment of premium shall be considered a request by the Insured for the Company to cancel.  In the event of such cancellation by the Company for Non-Payment of Premium, Minimum Premium shall be due and payable.

In the event of any other cancellation by the Company, the earned premium shall be computed pro rata not subject to minimum premium.

All other terms and conditions of this policy remain unchanged.

minearn.pre(F1) 2/95

EXHIBIT "A"

00056

Named Insured: The Allen Early 1998 Family Trust, Allen Early Planters Project LP

Policy Effective Date: 8/1/2006
Policy Expiration Date: 8/1/2007

This endorsement effective: 8/1/2006    forms a part of
Policy No: 79553787-00    issued on behalf of:  Chubb Custom Insurance Company

## ASBESTOS MATERIAL ENDORSEMENT

Notwithstanding any provision in the Policy to which this endorsement is attached, this policy does not insure against loss or expense resulting from:

1.      demolition or increased cost of reconstruction, repair, debris removal or loss of usenecessitated by the enforcement of any law or ordinance requiring asbestos material.

2.      any governmental direction or request declaring that asbestos material present in or part of orutilized on any undamaged portion of the insured's property can no longer be used for thepurpose for which it was intended or installed and must be removed or modified.

The total amount recoverable for both loss to property and asbestos removal expense under this endorsement shall be a part of and not in addition to the limits stated in the Policy.

All other terms and conditions of this policy remain unchanged.

asbest.mat(F1) 2/95



Named Insured:  The Allen Early 1998 Family Trust, Allen Early Planters Project LP

Policy Effective Date: 8/1/2006
Policy Expiration Date: 8/1/2007

This endorsement effective:  8/1/2006     forms a part of
Policy No: 79553787-00    issued on behalf of: Chubb Custom Insurance Company

## OCCURRENCE LIMIT OF LIABILITY

It is understood and agreed that the following special terms and conditions apply to this policy:

1. The Limit of Liability of $3,100,000.00, is a limit of amount per occurrence. Notwithstanding anything to the contrary contained herein, in no event shall the liability of this Company exceed this limit or amount in one disaster, casualty, or event, irrespective of the number of locations involved.

2. The premium for this policy is based upon the Statement of Values on file with the Company, or attached to this policy.  In the event of loss hereunder, liability of the Company shall be limited to the least of the following:

   a) the actual adjusted amount of loss, less applicable deductible(s);

   b) the total stated value for the property involved, as shown on the latest Statement of Values on file with the Company, less applicable deductible(s);

   c) the Limit of Liability or amount of Insurance shown on the face of this policy or endorsed on this policy.

All other terms and conditions of this policy remain unchanged.

occliab(F1 2/95)

EXHIBIT "A"                                                        00058

ENDORSEMENT NO. 1

Named Insured:        The Allen Early 1998 Family Trust, Allen Early Planters Project LP

Policy Effective Date:    08/01/2006

Policy Expiration Date:    08/01/2007

This endorsement effective: 12:01 A.M.    08/01/2006    forms a part of

Policy No:  79553787-00    Chubb Custom Insurance Company

Amendatory Endorsement

In consideration of the premium shown below, it is hereby understood and agreed this endorsement is attached to and forms part of the above policy and is effective as shown above.  This endorsement amends only the changes which are indicated by an (x) in the box immediately preceding such change:

1.  ☐ Policy is
2.  ☑ Item(s) listed below are amended to the policy schedule.
3.  ☐ Name of insured is amended as shown below.
4.  ☐ Insured mailing address is amended as shown below.
5.  ☐ Policy term is amended to:
6.  ☐ Endorsement No  is null and void
7.  ☐ Description of item(s) is amended as shown below.
8.  ☐ Limit of Liability is as shown below.
9.  ☐ Policy Reinstated
10. ☐ Other, as shown below

Amend Form Schedule:
**Deleted** Causes of Loss - Special Form (v. 04/02 CP10300402)
**Added** Causes of Loss - Basic Form (CP10100402) - *see attached*

Breakdown:
$        0.00 Premium
$        0.00 Terrorism Premium

$        0.00 Grand Total

_Thomas Wilson_
**Authorized Representative**

Issue Date:  09/08/2006

EXHIBIT "A"

COMMERCIAL PROPERTY
CP 10 10 04 02

# CAUSES OF LOSS – BASIC FORM

## A. Covered Causes Of Loss

When Basic is shown in the Declarations, Covered Causes of Loss means the following:

1. Fire.

2. Lightning.

3. Explosion, including the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass. This cause of loss does not include loss or damage by:

   a. Rupture, bursting or operation of pressure relief devices; or

   b. Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water.

4. Windstorm or Hail, but not including:

   a. Frost or cold weather;

   b. Ice (other than hail), snow or sleet, whether driven by wind or not; or

   c. Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters.

5. Smoke causing sudden and accidental loss or damage. This cause of loss does not include smoke from agricultural smudging or industrial operations.

6. Aircraft or Vehicles, meaning only physical contact of an aircraft, a spacecraft, a self-propelled missile, a vehicle or an object thrown up by a vehicle with the described property or with the building or structure containing the described property. This cause of loss includes loss or damage by objects falling from aircraft.

   We will not pay for loss or damage caused by or resulting from vehicles you own or which are operated in the course of your business.

7. Riot or Civil Commotion, including:

   a. Acts of striking employees while occupying the described premises; and

   b. Looting occurring at the time and place of a riot or civil commotion.

8. Vandalism, meaning willful and malicious damage to, or destruction of, the described property.

   We will not pay for loss or damage caused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars.

9. Sprinkler Leakage, meaning leakage or discharge of any substance from an Automatic Sprinkler System, including collapse of a tank that is part of the system.

   If the building or structure containing the Automatic Sprinkler System is Covered Property, we will also pay the cost to:

   a. Repair or replace damaged parts of the Automatic Sprinkler System if the damage:

      (1) Results in sprinkler leakage; or

      (2) Is directly caused by freezing.

   b. Tear out and replace any part of the building or structure to repair damage to the Automatic Sprinkler System that has resulted in sprinkler leakage.

   Automatic Sprinkler System means:

   (1) Any automatic fire protective or extinguishing system, including connected:

      (a) Sprinklers and discharge nozzles;

      (b) Ducts, pipes, valves and fittings;

      (c) Tanks, their component parts and supports; and

      (d) Pumps and private fire protection mains.

   (2) When supplied from an automatic fire protective system:

      (a) Non-automatic fire protective systems; and

      (b) Hydrants, standpipes and outlets.

 © ISO Properties, Inc., 2001 ☐

EXHIBIT "A"                                                                00060

10. Sinkhole Collapse, meaning loss or damage caused by the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   a. The cost of filling sinkholes; or

   b. Sinking or collapse of land into man-made underground cavities.

11. Volcanic Action, meaning direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   a. Airborne volcanic blast or airborne shock waves;

   b. Ash, dust or particulate matter; or

   c. Lava flow.

   All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   This cause of loss does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

## B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   a. **Ordinance Or Law**

      The enforcement of any ordinance or law:

      (1) Regulating the construction, use or repair of any property; or

      (2) Requiring the tearing down of any property, including the cost of removing its debris.

      This exclusion, Ordinance Or Law, applies whether the loss results from:

      (1) An ordinance or law that is enforced even if the property has not been damaged; or

      (2) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   b. **Earth Movement**

      (1) Earthquake, including any earth sinking, rising or shifting related to such event;

      (2) Landslide, including any earth sinking, rising or shifting related to such event;

      (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

      (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

      But if Earth Movement, as described in b.(1) through (4) above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

      (5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire or Volcanic Action, we will pay for the loss or damage caused by that fire or Volcanic Action.

   c. **Governmental Action**

      Seizure or destruction of property by order of governmental authority.

      But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

   d. **Nuclear Hazard**

      Nuclear reaction or radiation, or radioactive contamination, however caused.

      But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

   e. **Utility Services**

      The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises. Failure includes lack of sufficient capacity and reduction in supply.

      But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

      This exclusion does not apply to the Business Income coverage or to Extra Expense coverage. Instead, the Special Exclusion in Paragraph B.3.a.(1) applies to these coverages.

© ISO Properties, Inc., 2001    CP 10 10 04 02    □

**EXHIBIT "A"**    00061

**f. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if Water, as described in g.(1) through (4) above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion does not apply:

1. When "fungus", wet or dry rot or bacteria results from fire or lightning; or

2. To the extent that coverage is provided in the Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from:

a. Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

b. Rupture or bursting of water pipes (other than Automatic Sprinkler Systems) unless caused by a Covered Cause of Loss.

c. Leakage or discharge of water or steam from any part of a system or appliance containing water or steam (other than an Automatic Sprinkler System), unless the leakage or discharge occurs because the system or appliance was damaged by a Covered Cause of Loss. But we will not pay for loss or damage caused by or resulting from continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

d. Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control.

But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion.

e. Mechanical breakdown, including rupture or busting caused by centrifugal force.

But if mechanical breakdown results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

f. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

3. **Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

          © ISO Properties, Inc., 2001

EXHIBIT "A"                                              00062

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

(1) Any loss caused directly or indirectly by the failure of power or other utility service supplied to the described premises, however caused, if the failure occurs outside of a covered building. Failure includes lack of sufficient capacity and reduction in supply.

But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss resulting from that Covered Cause of Loss.

(2) Any loss caused by or resulting from:

(a) Damage or destruction of "finished stock"; or

(b) The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

(3) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

(4) Any increase of loss caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period of Indemnity Optional Coverage or any variation of these.

(5) Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

(6) Any other consequential loss.

**b. Leasehold Interest Coverage Form**

(1) Paragraph B.1.a., Ordinance Or Law; does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

(a) Your cancelling the lease;

(b) The suspension, lapse or cancellation of any license; or

(c) Any other consequential loss.

**c. Legal Liability Coverage Form**

(1) The following exclusions do not apply to insurance under this Coverage Form:

(a) Paragraph B.1.a., Ordinance Or Law;

(b) Paragraph B.1.c., Governmental Action;

(c) Paragraph B.1.d., Nuclear Hazard;

(d) Paragraph B.1.e., Utility Services; and

(e) Paragraph B.1.f., War And Military Action.

(2) The following additional exclusions apply to insurance under this Coverage Form:

(a) **Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

(i) Your assumption of liability was executed prior to the accident; and

(ii) The building is Covered Property under this Coverage Form.

(b) **Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

© ISO Properties, Inc., 2001

CP 10 10 04 02     ▢

EXHIBIT "A"

00063

## C. Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria

1. The coverage described in C.2. and C.6. only applies when the "fungus", wet or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

   a. A Covered Cause of Loss other than fire or lightning; or

   b. Flood, if the Flood Coverage Endorsement applies to the affected premises.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

   a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

   b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

   c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under C.2. of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of Covered Causes of Loss (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph b. of Covered Causes Of Loss 9., Sprinkler Leakage.

6. The following, 6.a. or 6.b., applies only if Business Income and/or Extra Expense coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense coverage form.

   a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

   b. If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

## D. Limitation

We will pay for loss of animals only if they are killed or their destruction is made necessary.

## E. Definitions

"Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

EXHIBIT "A"                                    00064

ENDORSEMENT NO. 2

**Named Insured:**       The Allen Early 1998 Family Trust, Allen Early Planters Project LP

**Policy Effective Date:**    08/01/2006

**Policy Expiration Date:**   08/01/2007

This endorsement effective: 12:01 A.M.    08/01/2006    forms a part of

**Policy No:** 79553787-00    Chubb Custom Insurance Company

Amendatory Endorsement

In consideration of the premium shown below, it is hereby understood and agreed this endorsement is attached to and forms part of the above policy and is effective as shown above. This endorsement amends only the changes which are indicated by an (x) in the box immediately preceding such change:

1. ☐ Policy is
2. ☑ Item(s) listed below are amended to the policy schedule.
3. ☐ Name of Insured is amended as shown below.
4. ☐ Insured mailing address is amended as shown below.
5. ☐ Policy term is amended to:

6. ☐ Endorsement No is null and void
7. ☐ Description of item(s) is amended as shown below.
8. ☐ Limit of Liability is as shown below.
9. ☐ Policy Reinstated
10. ☐ Other, as shown below

It is agreed and understood, the Valuation is amended to read Actual Cash Value (ACV) in lieu of Replacement Cost (RC).

**Breakdown:**

$       0.00 Premium
$       0.00 Terrorism Premium
$       0.00 Grand Total

**Issue Date:** 11/10/2006    _____
                              **Authorized Representative**

## ENDORSEMENT NO. 3

Named Insured:        The Allen Early 1998 Family Trust, Allen Early Planters Project LP

Policy Effective Date:        08/01/2006

Policy Expiration Date:        09/13/2007

This endorsement effective: 12:01 A.M.        07/10/2007        forms a part of

Policy No: 79553787-00        Chubb Custom Insurance Company

### Amendatory Endorsement

In consideration of the premium shown below, it is hereby understood and agreed this endorsement is attached to and forms part of the above policy and is effective as shown above. This endorsement amends only the changes which are indicated by an (x) in the box immediately preceding such change:

1. ☐ Policy is
2. ☐ Item(s) listed below are the policy schedule.
3. ☐ Name of insured is amended as shown below.
4. ☐ Insured mailing address is amended as shown below.
5. ☑ Policy term is amended to: 08/01/2006 to 09/13/2007

6. ☐ Endorsement No is null and void
7. ☐ Description of item(s) is amended as shown below.
8. ☐ Limit of Liability is as shown below.
9. ☐ Policy Reinstated
10. ☐ Other, as shown below

It is understood and agreed the policy expiration date is amended to read 9/13/2007 in lieu of 8/01/2007.

Additional Premium: WAIVED

**Breakdown:**

$        0.00 Premium
$        0.00 Terrorism Premium
$        0.00 Grand Total

Issue Date:  07/10/2007

*Thomas Wilson*
Authorized Representative

EXHIBIT "A"        00066

EXHIBIT B

May-02-07  17:33    From-BRAWLEY POLICE DEPT MENT 7603441453        7603511710              T-303  P.01    F-045

## Planters Hotel Investigation

Dft's EXHIBIT____8____
FOR IDENTIFICATION
GWENMARIE BOSWELL, C.S.R.
DATE: 9-13-07
   Allen Earley

**I.   Description**

Date: March 7th 2007
Time: 0023 hrs
Address: Planters Hotel, 100 Block of the South Plaza, Brawley, CA
Weather: 68. F wind calm humidity 17%
First Responding Unit: Chief Contreras 3901 and Eng. 3912 with Call-Paids
Incident Commander: Chief Frank Contreras
Second Alarm: Radioed in by Capt. Mark Franks in Eng. 3911
Third Alarm: Made By Chief Frank Contreras
Fourth Alarm: Made by Chief Frank Contreras

**II.   Observations**

Brawley Fire Department was dispatched to a structure fire at Mama Maggies' Restaurant at 480 West Main Street, Brawley, CA. Eng. 3911 responded with Capt. Mark Franks and a four man crew, in route to the fire, the Engineer of Eng. 3911 Rodger Smith requested that dispatch repeat the address of the fire and informed me that Planters Hotel was also on fire. I looked up and out of the driver's side window I observed thick black smoke blowing out of the fourth story windows from the far west to the middle of the west wing of the Hotel. I contacted dispatch to report that the Hotel was on fire and fully involved and to dispatch a second alarm to that location. As we proceeded to our original call at 480 West Main Street. Upon our arrival to our original call (Mama Maggie's), I heard Chief Contreras on the radio requesting second, third and fourth alarms for the Planters Hotel fire.

We could see the Planters Hotel fire from our location and I contacted the Chief Contreras via radio to update him on the status of the fire at my location. Chief Contreras requested we respond to his location as soon as we extinguished the fire. The fire was knocked down in approximately 15 minutes and I relinquished control of the scene to the Brawley Police Department whom remained on scene until the owner of the restaurant arrived to secure the property.

The crew of Eng. 3911 and I responded to the Planters Hotel fire. Upon our arrival we spotted the engine and established a supply line to the hydrant on the northwest corner of 3rd and Main Street which positioned Eng. 3911 across the street from Planters Hotel in a safe manner to utilize the installed monitor on top of the Eng.3911

Capt. Zendejas and I reported to Chief Contreras at the Command Post in front of Planters Hotels on Main Street. We were directed by Chief Contreras to return to the fire station and respond back to the Planters Hotel with Eng. 3991, the ladder truck.

1

### III.  Building Description

Built in 1927, the involved structure was multi-story metal framed building with a stucco exterior and lathe plaster interior.  The upper floors of the structure were accessed by stairwells located on the far ends of the building, another stairwell in the center section of the structure which accessed the lobby and by an elevator that was also located in the lobby.

The South-East portion of the west wing was constructed with a basement that was accessed by both a stairwell and the elevator located in the lobby.  The basement contains the control valve for the sprinkler system and was also used for storage and as a workshop.  Sprinklers were installed in every room and crawl space of the building, with every floor having a standpipe equipped with Fire Department hook-ups.

According to Doug Heumann, an attorney who represents Allen Earley, the property owner, in an article titled "Brawley loses cornerstone" in the Imperial Valley Press on March 8, 2007, Heumann stated that "Recent plans to convert the upper floors to a senior citizen apartments and construction had fallen through."

### IV.  Occupancy

The only occupied floor was the ground floor which was occupied by six different businesses:

Valley Café – Open and in Full Operation
Paddys XXI – Open and in Full Operation
Planters Drug Company – Not Open, had water damage that delayed the opening
Main Bar – Final fire inspection was completed on March 6, 2006 by Capt. Zendejas
Plus Size Repeat Boutique – Open, but closing at the end of the week
(approximately March 10th or 11th)
Curl Up & Dye – Open and in Full Operation

### V.  Investigation of the Building

After the fire was extinguished I was assigned Lead Arson Investigator of the fire and requested the assistance of the Imperial County Arson Taskforce.  The scene was secured for the investigation. The Arson Investigation Team members were: Capt. Bradley Garrison, Imperial County Fire; Chief Anthony Adams, Centinela State Prison Fire; Asst. Chief Alex Silva, Holtville Fire. Investigators made a complete appraisal of the exterior from a distance and then around the structure close-up. The fire scene was secured by a six foot fence and 24 hour a day security guards were posted to maintain the chain of custody and to ensure the safety of the public.

After the initial assessment of the fire scene, the team regrouped to form an action plan for a cause and origin investigation and to determine the stability of the structure. The investigative team also included Detective Johnathan Blackstone from the Brawley Police Department. The Team determined that assistance from Brawley Pubic Works and

2

Building Department would be needed in addition to the San Diego Arson Task Force, and the Alcohol Tobacco and Firearms Agency.

Upon completion of the assessment of the stability of the building and under strict supervision by Chief Contreras, each business owner was allowed to remove personal property from their respective businesses located on the ground floor of the Planters Hotel. This action was determined acceptable by Chief Contreras because the location, on the North side of the building, where the business fronts were located was relatively undamaged . Prior to admitting the business owners into the building business was inspected to rule out the possibility of being the area of origin of the fire or to posses evidence relative to the investigation.

On Monday, March 12th the Arson Investigation Team met to finalize the action plan. The Brawley Police Chief Mark Gillmore assigned Detective Johnathan Blackstone as their lead investigator on the Arson investigation, and he also contacted the San Diego Arson Task Force to request their services in this investigation. The San Diego Arson Task Force agreed to participate and provide an Accelerant Detection Dog to assist in the investigation. Capt. Garrison from County Fire contacted the Alcohol, Tobacco and Firearms Agency for their assistance. A request was also made to the Imperial County Sheriffs Office to provide a Forensic Photographer for photo recording. The Director of the Public Works provided a backhoe and operator to assist with the excavation of debris, while the Director of the Building Department requested "Spotters" to be available to watch the structure for signs of collapse or stability issues. Fire Chief Contreras also requested an inquiry of the City Records for plans and blueprints of the structure. I scheduled manpower from Brawley Fire, food, water and other base camp necessities to facilitate the investigators.

The following day, Tuesday, March 13th at 0900 the Arson Investigation Team which included the outside agencies investigators, met at the Brawley Police Department to review information relative to the fire suppression efforts, history of the building and its occupancy. An action plan was made prior to any investigative efforts being made at the incident site  Upon the Teams arrival at the location; we were made aware that the owner and his attorney were present. The lead agent of the Alcohol, Tobacco and Firearms Agency identified himself to the owner and his attorney and requested signed authorization and approval for the team to conduct a Cause and Origin Investigation of the Planter's Hotel structure and the surrounding area. Authorization was given by the owner and his attorney. The initial team did not discuss with the outside agencies investigators the suspected points of origins identified during the initial investigation in order to allow an unbiased opinions to be formed. After the San Diego Arson Task Force and the Alcohol, Tobacco and Firearms Agency made a complete detailed initial assessment that included an examination of all the exterior areas to rule out a fire that emanated from the outside of the structure or an intentionally-set fire that was set on the outside of the structure by someone who could not penetrate the structure. Once this exterior assessment was completed the Arson Investigation Team regrouped to discuss each individual's observations of the structures exterior. There is a distinct "V" burn pattern on the exterior rear side of the building that goes directly upward from the first floor to the fourth floor (photo paper # 1 - # 2.) Excavation of the ground floor in this area was conducted with the assistance of the backhoe and shovel to remove the debris of

3

the collapsed portions of the building down to the concrete walkway. Subsequent to the excavation, the Accelerant Detection Dog was brought to the area with negative results. Which suggests that common combustibles may have been used rather than petroleum based products and possibly shoved into the holes that were knocked into the interior walls. There was no interior fire suppression efforts made to the structure that would account for this damage. Addition, since no interior efforts were made by fire personnel the holes made in the interior portion on the structure were ruled out to be related to suppression efforts.

Then as a group, we preceded into the standing portion in the south-west portion of the structure. The first observation was the west doors of the lobby (photo paper # 3). The doors were unlocked and a padlock was locked on the open end of the latch. Briefly stated, the doors had been left unsecured prior to the fire. There was no sign of fire or vandal damage to the doors or the locking mechanism. Upon entering through the open doors the team observed fire damage that was heavy on the left side interior of the lobby and the stairwell which was the west wing of the structure proceeding left to right with minimal damage to the east wing. (Photo paper # 4). The structure in this area was . severely damaged by the fire. The team proceeded through the structure with care continuously aware of the soundness of the structure.

A point of origin was located under the stairwell in the southwest corner of the west wing on the first floor. This location was also identified (hit-on) by the Accelerant Detection Dog. Another point of origin was in the courtyard behind the dumpster on the first floor. Other points of origin were observed through their burn patterns but we were unable to pinpoint the exact location due to structure, fire and water damage. Damage to the stairwell was severe and complete in some areas with heavy charring on the underside of what was still remaining of the wooden components, suggesting that combustible items were located under the stairwell.

Heavy damage was noted on the wooden floor joist of the 3rd floor in three areas. Damage of this type indicated prolonged or intense flame impingement. Damage in these areas was severe enough to cause warping of the structural steel components of the building. Yet as complete as the damage was in these areas, it was noted that the areas adjacent, 6-8 feet to either side was consistent to the remainder of the building and in some areas still partially intact. Damage of this nature suggests that there were multiple origins of the fire on the 2nd floor.

The team also observed at several different locations throughout the structure, areas that appeared to be a type of rehab in the interior of building (several holes in the walls, (photo paper # 5 - # 6). These areas allowed transient combustion to penetrate upward through the walls at a rapid rate of speed.

The team attempted to inspect the fire sprinkler system located in the basement. However, access to the basement was hindered due to the high water level from extinguishing the fire. The Brawley Public Works Department was requested to pump the water out of the basement. The team concluded the day's investigation and would resume once the basement was accessible. Again the scene was secured by 24 hour a day

4

security guards whom were posted to maintain the chain of custody and to ensure the safety of the public.

The following day, Wednesday, March 14th, the water was pumped out from the basement and the team entered the basement. The fire sprinkler system control valve was identified and inspected. The control value was in the closed position and was not secured with the required padlock and chain. To confirm these findings, I had a certified expert of building fire sprinkler systems from Western Fire Protection Inc. to inspect the control valve. The inspector confirmed that "the system control valve (an eight inch O.S.&Y) was in the closed position indicating the fire sprinkler system was not active at the time of the fire"( photo paper # 7 ). Written documentation has been provided by the inspector for this investigation.

## VI.   Contributory Factors

1. Arson Multiple Origin Points
2. Fire Sprinklers Deactivated
3. Opportunity for access (unlocked doors)
4. Two Structure fires at the same time located seven blocks from each other (The Planters Hotel was ruled as arson and the Mama Maggies' fire was ruled to be arson and intentionally set with the use of accelerants)
5. Type of Rehab of interior of building (several holes in walls, etc...)
6. On-Duty Staffing; (1) five man engine company

## VII.   Conclusion

After a thorough investigation was conducted by the Arson Investigation Team it has been determined that the fire at the Planter's Hotel structure was arson. This conclusion is based on several factors that attributed to the findings. This fire was caused by the intentional act(s) of a person or persons inside the structure. Fires were set at several separate areas of the structure identified as points of origin. This investigation establishes that these fires occurred in areas significantly distant from each other and in a time frame that precludes any assumption of a single ignition source or accidental cause. In addition the Fire Sprinklers System was deactivated. Several areas of rehabilitation in the interior (holes in the walls), and an opportunity for access (unlocked doors). Another fact that may be related to the hotel fire is the fact that all of the staff on duty responded to the Mama Maggies' Restaurant as a standard procedure. This left no staff to respond to the hotel fire until additional off duty personnel responded or mutual aid arrived. The Brawley Fire Department only had four fire fighters and one call paid on duty at the time of the fire and suspiciously there where two arson fires set in Brawley at the same time located at different ends of the city. The Brawley Fire Department had to call in a fourth alarm mutual aid on this structure fire. Fire Departments that responded to the fourth alarm mutual aid call came from agencies within Imperial Valley and the City of Yuma, Arizona.

Detective Jonathan Blackstone from the Brawley Police Department questioned the business owners and took their statements. He will continue and follow up on the criminal investigation portion of this Arson Fire.

5

## Initial Arson Investigation Team

Captain Mark Franks, Brawley Fire Department
Chief Anthony Adams, Centinela State Prison Fire Department
Assistant Chief Alex Silva, Holtville Fire Department
Captain Brad Garrison, Imperial County Fire Department
Captain Tony Rouhotas, Imperial County Fire Department

## Full Arson Investigation Team

Captain Mark Franks, Brawley Fire Department
Chief Anthony Adams, Centinela State Prison Fire Department
Assistant Chief Alex Silva, Holtville Fire Department
Captain Brad Garrison, Imperial County Fire Department
Detective Johnathan Blackstone, Brawley Police Department
Photographer J. Godsey, Imperial County Sheriffs Office
R. Verducco, Alcohol Tobacco and Firearms
Joe Mokos, Alcohol Tobacco and Firearms
John Schidt, Alcohol Tobacco and Firearms
Mike Merrike, San Diego Fire Department
Dave Tucker, San Diego Fire Department

Captain Mark Franks
Arson and Bomb Investigator
Brawley Fire Department

6

EXHIBIT "B"

EXHIBIT **C**

## DENNIS H. MORITA
A Professional Corporation

300 SOUTH IMPERIAL AVE., SUITE 9
EL CENTRO, CALIFORNIA 92243

TELEPHONE (760) 353-3232
FACSIMILE (760) 353-3535
E-MAIL: dmorita@morita-law.com

December 28, 2007

VIA FACSIMILE
Tressler, Soderstrom, Maloney & Priess, LLP
1901 Avenue of the Stars
Suite 450
Los Angeles, CA 90067

Attn: Paul S. White, Attorney at Law

Re: City of Brawley Public Records Act Request-Planters Hotel

Dear Mr. White:

Attached are copies of two documents which I am informed represent all of the records not previously produced in response to your request.

Very truly yours,

DENNIS H. MORITA, APC

*Dennis H. Morita*

Dennis H. Morita

Co: Chief Gillmore
      Chief Contreras

DHM: mb

EXHIBIT "C"

00073

 **Western Fire Protection Inc.**

March 14, 2007

City of Brawley
Fire Department
815 Main Street
Brawley, CA 92227

Attention: Chief Frank Contreras

Reference: Planter's Hotel
            Brawley, CA

Dear Chief Contreras,

At your request, I inspected the recently fire damaged Planter's Hotel in Brawley, CA. I entered the basement moments after water was pumped from it. Our objective was to inspect the control valve for the buildings fire sprinkler system.

The system control valve (an eight inch O.S.&Y) was in the closed position indicating the fire sprinkler system was not active at the time of the fire.

If I can provide any further information regarding this matter, please feel free to call me.

Respectfully,
WESTERN FIRE PROTECTION, INC.

Marvin D. Mc Clure
Project Manager/Estimator

MDMC:me

2972 S. Kyia Ave., Suite B □ Yuma, AZ 85365 □ PHONE (928) 344-5741 □ FAX (928) 344-5742
CA Lic. # C16-588039    AZ Lic. # 107150

EXHIBIT "C"

00074

**Brawley Fire Department**
**Captain Jesse G. Zendejas**
**815 Main Street**
**Brawley, CA 92227**
                                                                    **April, 13, 2007**

**Subject:** Discovery of Fire Sprinkler System at the Planters Hotel being shut down.

**To:** Detective Blackstone, Brawley Police Department

On February 15, 2007 while checking the inspection log, I noticed that there was a request for a new business inspection for the Planters Bar. The Planters Bar is located in the 300 block of Main Street and is suite101. I called the business owner and requested to perform the inspection. I performed the inspection with the assistance of Firefighters Alberto Cosio, Eloy Martines and Call-paid Firefighter Jonathan Garcia. The inspection involved the measurement of the square footage of the floor area to determine the occupancy load limit. The inspection revealed:

1. That the occupancy load limit was at 234 people and a sign so noting it needed to be posted on a wall which was visible to all in the business.
2. It also revealed that some electrical wiring for lighting and sound systems that were stapled or nailed to the ceiling in the band stage area needed to be redone.
3. Exit signs that were lighted also need to be posted over the doors.
4. Address numbers of a minimum high of 4" tall, were also needed at the front door entrance to the business.

The occupant Ms. Elena Zarate and her son Luis were given the results of the inspection. I advised them that I was giving them up till March 3rd to comply with my inspection results. I also instructed them to call me if and when they were ready for a re-inspection. They agreed to make the necessary corrections or additions to the business. It wasn't until March 6th while working on A Shift with Mark Franks, that I was able to go and perform the re-inspection.

On March 06, 2007 while working on A shift, I asked Capt. Mark Franks if I could go and perform a re-inspection of the Planters Bar. I was working an overtime shift and was not working in my usual capacity of B shifts supervisor. Capt Franks agreed to send Call-paid Firefighter Ricardo Jasso and myself to the re-inspection.

I was greeted by Ms. Zarate's son, Luis and he walked us through the business to look for the corrections. I noticed that the occupancy load limit sign that was posted over the front door was too small. I advised Luis that he needed to post a bigger sign. I also advised Luis that the wiring on the ceiling over the band stage area were not quite right. I advised him that they needed improvement.  While looking up at the ceiling areas I noticed that there were fire sprinklers heads. I then came to the realization that I must have missed the fire sprinkler heads during the first inspection on February 15th.  I must have missed the sprinkler heads due the fact



that the rooms in the business were dark at the time. The power was not connected and the building was not well light.

I asked Luis if he or they had any record of the sprinkler system being up to date, serviced and operable. He stated that he was not sure, but that he could walk us to see the sprinkler systems' main riser, if we liked. I requested to see the sprinklers system riser. He walked CPF Jasso and me to the basement of the hotel. He showed us what appeared to be a 2 ½" diameter water pipe with a ¼" turn type valve hanging from the ceiling. I immediately advised him that it did not appear to be the sprinkler system main riser. He stated that he would take us to another place and he walked us to another location in the basement.

He took us to a place in the basement that indeed housed what I believed to be the fire sprinkler system riser. I noticed that the riser fixture had a gauge that indicated a pressure of 0. I also noticed that the riser's main valve, which was of the outside stem and yoke type (OS&Y) appeared to be in the closed position. I pointed out to CPF Jasso that when the stem in the center of the valve wheel is in and not showing, means that the valve is closed. The valve was leaking water slightly.

I asked Luis why the sprinkler system riser valve was closed and shut off and he stated that he did not know. I advised him that I would not be able to sign-off the inspection for his new business license due to the corrections not being quite ready, that I had pointed out to him just a little earlier. I also advised Luis and CPF Jasso that I was certain that the sprinkler system needed to be opened and operable. I asked Luis if he would find out why it was shut off. I also advised him that I would be looking into it myself.

I was not in any position to open the sprinkler systems riser main valve myself, as easy as it may have seemed or been. I figured that if I were to open the water flow, a leak or break in the system may cause damage to someone's business with-in the hotel. The system's integrity may have been compromised and that may have been the reason for the shut down. I could not take any chances.

When I returned to the firehouse, I found Chief Frank Contreras, Capt. Franks, Lt. Charles Peraza, and FF. Rodger Smith standing in the station's front engine room. In the presence of those standing there and CPF Jasso, I advised Fire Chief Frank Contreras of my finding. I stated to Chief Contreras that I had discovered the fire sprinkler system at the Planters Hotel to be shut-off. He replied by asking if I or any one in the department had been made aware or was aware of it being shut-down? I advised him that I was certainly not aware or had been made aware at any time of the system being shut down. Chief Contreras turned and asked those present if they had been made aware of the system being shut. They all replied that they had not been made aware of it either.

Chief Contreras stated that he would be looking into the matter from the owner of the Planters Hotel. He gave me the impression that he would be looking into the

DENNIS H MORITA APC

PAGE 8!

matter the very next day. At the time I guess, we believed the very next day would be soon enough to look into the matter. In hind sight, it turned out to be too late.

About a week after the fire, I remembered that a contractor or builder of some sort had called the Fire Department last year wanting to obtain permission from us to do some alterations to either the fire sprinkler system or the fire stand-pipe system at the Planters Hotel. I referred that contractor to Chief Contreras at that time. Chief Contreras advised me that he and Capt. Mark Franks had handled that request from the contractor.

Upon speaking to Chief Contreras about the incident with the contractor, he advised me that it only involved removing and repositioning the piping to the stand-pipe system. I asked Chief Contreras if perhaps that contractor had shut-down the fire sprinkler system himself without his knowledge and approval. Chief Contreras stated that he never gave him permission to shut it down and if he did he would have done it without his approval or permission.

EXHIBIT "C"

00077



**Douglas C. Heumann**
**Attorney at Law**
4106 Peninsula Drive
Carlsbad, California 92010
Phone (760) 353-3772
Fax (760) 336-2734

March 28, 2007

**VIA EMAIL AND FEDEX**

Mr. Chris Copeland
Executive General Adjuster
Assistant Vice President
Chubb Custom Insurance
1072 S. De Anza Boulevard
Suite A 107
San Jose, California 95129

        Re:      The Allen Earley 1998 Family Trust
                    Policy No: 79553787-00
                    Claim No: 047507014833
                    Company: Chubb Custom Insurance Company
                    Date of Loss: March 7, 2007
                    Type of Loss: Fire
                    Location: 101 South Plaza, Brawley California

Dear Mr. Copeland:

Thank you for your letter dated May 18, 2007 and your email following up our conversation on May 18th. In your letter and email you informed the Trust that the Brawley Fire Department inspected the building on March 6th and discovered that the fire suppression system was off. This discovery was made during an inspection for the Planters Bar. I was able to get in contact with Mr. Luis Torres who you indicated was present during the inspection. Luis is the 18 year old son of Ms. Elena Zarate who operated the Planters Bar.

I spoke with Luis on May 18th at my office in El Centro. Luis told me he was at the inspection with Captain Zendejas. Luis told me that their business license was denied due to the fact that the sprinkler heads in the bar were too old. He was given a paper saying the denial was due to the sprinkler heads. He does not know where that paper is and has been unable to locate it. We believe it might have been lost in the fire.

Captain Zendejas asked Luis if he could look at the sprinkler system main valve after Captain Zendejas denied the permit and issued Luis the denial. Luis did not know where this was but told the Captain that the basement had a "bunch of pipes". He and the Captain went down to the basement and the Captain pointed out to Luis that the system was off. Luis has told me he did not know what this meant and didn't really pay attention since his mother request for a license was already denied. Luis is an 18 year old émigré

from Latin American. He is not very sophisticated but is a very good person with good intentions. He never relayed any of the information concerning the sprinkler system to Allen or the Trust. He also never told Allen about the inspection by the fire department. He now feels very bad that he did not do so. Luis has told us he will make himself available to Chubb if they have any questions concerning what he knew and when.

Luis has also made himself available to Detective Blackstone with the Brawley Policy Department. Detective Blackstone previously requested a meeting with Luis which has been scheduled for this Wednesday, May 23. Upon learning the information from you and Luis, Allen contacted Detective Blackstone and made this information available to Brawley Police Department. Mr. Blackstone indicated this information was not important to his investigation and he needed to speak with Luis regarding other parties that investigators determined are "persons of interest." Luis is not under suspicion and nor should he be.

Allen was never served with any notification from anyone concerning anything about the sprinkler or fire suppression system. Allen has previously sworn in the affidavit accompany my letter to you and Mr. Mackley dated March 28, 2007 that he had no knowledge that the fire suppression system was turned off. Based on this new information, Allen is prepared to sign a new affidavit to include that he was not made aware of fire suppression systems condition before the fire by anyone. In addition, he was not aware of the inspection made by the Brawley First Department We will prepare this affidavit separately from this letter and send it to you by the end of the week.

We will attempt to get any documentation the Brawley Fire Department may have concerning this issue. However, we do not feel this is necessary to determining coverage under the policy. Any information concerning the fire suppression system was never conveyed to Allen. What other persons may have known is moot if they kept that knowledge away from Allen and the Trust. If you have proof or reason to suspect that Allen knew the fire suppression system was not on, please forward that information to us. Allen has been very forthcoming with any information requested by Chubb. He is very distressed that after two and a half months, Chubb is still questioning whether or not he knew the fire suppression system was off. This new information just proves he knew nothing and the Trust new nothing.

We are very aware of the work you and your office have put into investigating this matter and we are very grateful. At this time the Trust request from you a correspondence indicating where Chubb is in its investigation of the claim and what it still needs to investigate. We do not mean to place an undue burden on you or Chubb. Due to the length of time that has elapsed, we need to evaluate where Chubb is at and how much longer the process might take.

I am also enclosing with this letter a detailed breakdown of the expenses so far on the demolition process. Please forward payment of these bills as soon as possible.

5 22 2007
Page 3 of 3
Mr. Copeland

Also, the trust has received the check for $129,138.08. We will be forwarding this check to IPS for payment of the subcontractors tomorrow. Thank you again for expediting this money to the Trust.

Very Truly Yours

Douglas C. Heumann

cc:    Allen Earley, Trustee

**EXHIBIT "D"**

**00080**





**RJA**
ROLF JENSEN & ASSOCIATES, INC.
FIRE PROTECTION CONSULTANTS

649 N. 44th Street
Suite 204W
Phoenix, AZ 85008-6547 USA
www.rjainc.com
+1 602-956-6000
Fax +1 602-956-6001


**THE ALLEN EARLY 1995
FAMILY TRUST**

**DATE OF FIRE: MARCH 7, 2007**

**CHUBB CLAIM #047507014833**


**REPORT OF:
STEVEN A. SHELDON, P.E.**

**JUNE 26, 2007**

**RJA Project A42538**

THE ALLEN EARLY 1998 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page 1
June 26, 2007

THE ALLEN EARLY 1998 FAMILY TRUST
DATE OF FIRE: MARCH 7, 2007
CHUBB CLAIM #047507014833
REPORT OF: STEVEN A. SHELDON, P.E.
MAY 30, 2007

## INTRODUCTION

This report documents my preliminary opinions related to the March 7, 2007 fire at the Allen Early property located at 101 S. Plaza in Brawley, California. The opinions provided are based on my on-site observations and activities of April 12, 2007, in addition to review of documents listed in Attachment A. Attachment B (schematic drawings) and Attachment C (writer's responses to Chubb questions) are also included as a part of this report. The opinions provided are subject to revision based on additional information reviewed, and/or additional case information.

## BACKGROUND

The referenced Allen Early property is a four story building with a fifth story penthouse and a partial basement constructed in approximately 1927. A wet pipe fire sprinkler system was installed within the building in 1927. The building was partially occupied by restaurant/bar and retail tenants on the first floor. A telecommunications tenant occupied the fifth floor penthouse. The remaining floors were undergoing renovation by the building owner. At approximately 12:23am on March 7, 2007 a fire occurred in the building. The fire was determined to be arson, and the building was destroyed as a result.

Based on my conversations with Chief Frank Contreras of the Brawley Fire Department and Mr. Arne Eaton of the Brawley Building Department, at the time of the fire the 1985 Uniform Fire Code (UFC) and the 2001 California Building Code (CBC) were legally enforceable documents by the City of Brawley.

### Relevant Building Code Information

In accordance with CBC section 104.2.1, "The building official is hereby authorized and directed to enforce all the provisions of this code. For such purposes, the building official shall have the powers of a law enforcement officer."

In accordance with section 106.1 of the CBC a permit from the building official is required to be obtained for buildings which are erected, constructed, enlarged, altered, repaired, moved, improved, removed, converted or demolished unless the work is exempted from permit as described under section 106.2. Based on a recorded statement from the building owner, the work that was being performed constituted alteration, improvement, conversion and demolition work which is not

THE ALLEN EARLY 1998 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page 2
June 28, 2007

exempted from permit under CBC section 106.2. The author of this report has not been provided with any information and/or documentation that indicate that a permit had been submitted by the owner and approved by the building official for the work that was being performed prior to the fire.

Additions, alterations or repairs to an existing building are required to comply with the provisions of CBC Chapter 34 (Existing Buildings). The general premise of this chapter is that buildings to which additions, alterations and repairs are made shall comply with all provisions of the CBC on a retroactive basis. There are, however, provisions under this chapter which allow only those areas of additions, alterations or repairs to be CBC compliant.

CBC application summary – Based on the information reviewed, additions, alterations and repairs of this building were occurring or had occurred prior to the fire on March 7, 2007. One or more building permits were required to be submitted for the work described. Permit documents for the referenced work have not been received to date. If permits had been applied for, and if the Building Department was diligent in the application and enforcement of the current building code, then it is likely that the building systems (e.g. mechanical, electrical, fire) would have been required to be upgraded to meet current code requirements. Code-required fire protection upgrades would have included replacement of the existing sprinkler system and the installation of a fire alarm system including smoke detectors, manual fire alarm stations, waterflow alarm and valve tamper supervision. The fire alarm system would be required to be monitored by a constantly attended location.

Relevant Fire Code Information

The installation, inspection, testing and maintenance of fire protection systems are governed by the applicable fire code. As previously discussed, the applicable fire code at the time of the fire was the 1985 Uniform Fire Code (UFC).

Section 1.103(b) of the UFC states that, "The provisions of this code shall apply to existing conditions as well as to conditions arising after the adoption thereof, except that conditions legally in existence at the adoption of this code and not in strict compliance therewith shall be permitted to continue only if, in the opinion of the Chief, they do not constitute a distinct hazard to life or property." In summary, this scope statement indicates that where the Chief feels that hazardous conditions exist, that he is authorized to enforce the code retroactively regardless of whether the conditions are legally existing.

UFC section 1.102(b) states that, "Where no specific standards or requirements are specified in this code, or contained with other applicable laws (or adopted codes) or ordinances, compliance with the standards of the American Insurance Association, the National Fire Protection Association or other nationally recognized fire-safety

THE ALLEN EARLY 1998 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page 3
June 28, 2007

standards as are approved by the Chief shall be deemed as prima facie evidence of
compliance with this intent". Since the UFC doesn't specifically list or adopt a
standard related to fire protection system inspection, testing and maintenance
practices, this statement allows the Chief to utilize a nationally recognized standard
of his choice for enforcement of this activity. Based on a May 23, 2007 phone
conversation with Brawley Fire Chief Frand Contreras, the writer of this report was
informed that the Chief has not formally identified any particular standard for the
purposes of enforcing fire protection inspection, testing and maintenance practices.

Under UFC section 2.201, the local fire prevention bureau has the responsibility to
"inspect as often as may be necessary, all buildings and premises...for the purpose
of ascertaining and causing to be corrected any conditions which would reasonably
tend to cause fire or contribute to its spread..." During a May 23, 2007 phone
conversation with Brawley Fire Chief Frank Contreras, the writer of this report was
informed that the Fire Department does not inspect buildings on a regular basis and
that building inspections are generally performed by request only.

UFC section 10.301(e) states that, "All fire alarm systems, fire hydrant systems, fire
extinguishing systems...shall meet the approval of the Fire Department as to
installation and location and shall be subject to periodic tests as required by the
Chief."

UFC section 10.302(a) states that, "All sprinkler systems, fire hydrants, standpipe
systems, fire alarm systems...shall be maintained in operative condition at all times
and shall be replaced or repaired where defective".

UFC section 87.104(b) states that, "When the building is protected by fire protection
systems, such systems shall be maintained operational at all times during alteration".
"...When it is necessary to shut down the entire system, a fire watch shall be kept on
site until the system is returned to service."

UFC Application Summary – The Chief is allowed to apply the requirements of
the fire code retroactively if distinct hazardous conditions exist. The writer is
not aware of any determinations by the Chief that distinct hazardous
conditions existed at this location. Where no specific requirements exist, the
Chief is allowed to apply and enforce nationally recognized standards as
prima facie evidence of compliance with the intent of the code. No specific
standards are referenced by the UFC for the inspection, testing and
maintenance of fire protection equipment. NFPA 25 *Inspection, Testing and
Maintenance of Water Based Fire Protection Systems* is a nationally
recognized standard on this subject. The 1981 edition of NFPA 13A is a
recommended practice for the inspection, testing and maintenance of
sprinkler systems which was in print at the time of Brawley's adoption of the
1985 UFC. Both of these documents would require that sprinkler control
valves are either locked in the open position or monitored by a central station;

EXHIBIT "E"

00084

THE ALLEN EARLY 1998 FAMILY TRUST                    A42536 - Page 4
REPORT OF STEVEN A. SHELDON, P.E.                    June 26, 2007

In either case, the valves would be required to be inspected on a weekly or monthly basis respectively. There is no evidence to suggest that the Fire Department utilizes or enforces either of these standards. The Fire Department is charged with the responsibility to inspect buildings and structures as necessary to ascertain conditions which would cause or contribute to the spread of fire. Based on the writer's May 23, 2007 phone conversation with Brawley Fire Chief Frank Contreras, the Fire Department does not inspect buildings on a regular basis and building inspections are generally performed by request only. In the writer's opinion, the Brawley Fire Department failed in their duty to apply and enforce a reasonable standard of care related to the inspection testing and maintenance of fire protection systems. The sprinkler control valve was found shut prior to the fire which is a violation of UFC section 10.302(a). At some point the entire fire system was shut down and a fire watch was not initiated. This action is in violation of UFC section 87.104(b)

OTHER RELEVANT INFORMATION & OBSERVATIONS

At the time of my on-site activities I observed that the main sprinkler valve that is located interior to building and in the basement was closed. At that time I also noted that the fire sprinkler system drain valve was in the fully open position. The fire system drain valve is typically opened to drain the system of water prior to performing work on the sprinkler system. Based on visual on-site observations, review of the Brawley Fire Department Investigation Report, and my May 9, 2007 phone conversation with Captain Zendejas of the Brawley Fire Department, the installed fire sprinkler system was not operational at the time of the fire. Because the main control valve for the fire sprinkler system was shut, it was not capable of functioning properly at the time of the fire. At this time it is not known when the sprinkler system control valve was shut or by whom. Based on the writer's experience, it is more likely than not that the sprinkler system valve was closed by a fire protection contractor or other person knowledgeable in sprinkler system operations. The basis for this opinion is due to the fact that the sprinkler system drain valve was open.

The main sprinkler shut-off valve is located in the basement of the building which is accessible only from a single door located on the south side of the building and out of public view. The owner has stated that he entered the basement at least monthly but was not intimately familiar with the fire protection system or main shut-off control valve. It is unknown specifically who had access to the basement area or whether the basement access door was normally locked.

Based on the owner's recorded statement and information provided by the cause and origin investigator, a fire alarm panel was present within the first floor hotel lobby of the building. It is unknown when this panel was installed or specifically its function. The owner has stated that the panel was not connected to an off-site monitoring

THE ALLEN EARLY 1998 FAMILY TRUST                    A42638 - Page 5
REPORT OF STEVEN A. SHELDON, P.E.                    June 28, 2007

service. Reportedly, the panel was displaying a lit yellow light prior to the fire.
Yellow fire alarm panel lights are typically used to indicate a "trouble" condition on
the system. A trouble condition indicates that something adverse has been detected
which may preclude the system from functioning properly. Typically, a local audible
alarm such as a buzzer or horn would sound from the alarm panel upon the
detection of a trouble condition. The local alarm would also normally have to be
silenced through a push-button acknowledgement of the trouble condition at the fire
alarm panel. At the time of my site visit I observed that a waterflow alarm device
had been installed immediately downstream of the fire sprinkler system shutoff valve.
It is unknown whether or not the waterflow alarm device is connected to the fire
alarm panel or if the reported trouble signal was caused by the waterflow switch.

The California State Fire Marshal and the County of Imperial Building Department
have no jurisdiction over this building.

During my on-site activities I noted approximately six different sprinkler head styles
and associated manufacturing dates. The newest sprinkler model noted was 2002.
I also noted a sidewall sprinkler head which had exhibited signs of leakage. Based
on the owner's tape recorded statement, there had been at least four tenant
improvement projects (Nextel, American Title, Paddy's Bar, Hair Salon) that were
either completed or ongoing. Based on the owner's description of the projects, it is
likely that the sprinkler system was shut down one or more times to accommodate
sprinkler system modifications or to prevent accidental sprinkler discharge.

Reportedly, the Brawley Fire Department denied a tenant improvement permit based
on the sprinkler system being "too old". Based on the requirements and
commentary within NFPA 25, sprinklers that are older than 50 years are required to
be operationally tested every 10 years. In doing so, a representative sample (1% of
each sprinkler type) is to be removed from the system and sent for testing by an
independent lab. If one or more of the sample sprinklers fail to operate properly,
then all of the system sprinklers are to be replaced. Based on sprinklers which were
installed in 1927, four sets of representative samples should have been sent out for
testing to date; there is no evidence that this has occurred.

It is incumbent upon the building owner to comply with all codes, ordinances and
applicable requirements related to the use and occupancy of their building. The
owner was not diligent in his efforts to understand and comply with requirements
related to the inspection, testing and maintenance of the fire sprinkler system, and
was not diligent in his efforts to submit permits and perform renovations in
accordance with the applicable building code. Additionally, the Brawley Fire

THE ALLEN EARLY 1998 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page 8
June 26, 2007

Department failed to establish written policies and procedures related to the
inspection, testing and maintenance of fire sprinkler systems, and the Brawley
Building Department failed to diligently enforce compliance with their building code
as it relates to the use, renovation and change of occupancy of a structure.

PREPARED BY:

Steven A. Sheldon, P.E.
Engineering Manager

THE ALLEN EARLY 1998 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page A-1
June 28, 2007

**ATTACHMENT A**

**DOCUMENTS REVIEWED**

THE ALLEN EARLY 1996 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page A-2
June 26, 2007

## ATTACHMENT A

## PUBLISHED DOCUMENTS REVIEWED

### 1985 Uniform Fire Code

- Article 1 – Title, Intent and Scope
- Article 2 – Organization, Authority, Duties and Procedures
- Article 4 – Permits
- Article 9 – Definitions and Abbreviations
- Article 10 – Division III – Installation and Maintenance of Fire Protection, Life Safety Systems and Appliances
- Article 87 – Fire Safety During Construction, Alteration or Demolition of a Building
- Appendix III-A – Testing Fire-Extinguishing Systems, Standpipes and Combination Systems
- Appendix V-A – Nationally-recognized Standards of Good Practice

### 1981 Edition of NFPA 13A - Recommended Practice for the Inspection, Testing and Maintenance of Sprinkler Systems

### 2001 California Building Code

- Chapter 1 – Administration
- Chapter 34 – Existing Buildings

EXHIBIT "E"

00089

THE ALLEN EARLY 1988 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page B-1
June 26, 2007

**ATTACHMENT B**

**SCHEMATIC DRAWINGS**

Site Schematic Drawing

State Route 78

Covered Walkway

4 Stories

5th Story Penthouse

1 Story Parking & Retail

S. Plaza Drive

Third Street

Allen Early Planters Bldg
RSA # A4/258
April 12, 2007

Schematic Drawing
Not to Scale

00091

Allen Early Planters Bldg
RJA - A42538
April 12, 2007
Schematic Drawing →
Not to Scale

Fire Protection
Water Distribution
Piping Schematic

8" in. from Street
8" E. Mass Driveway

Curb Box Valve

Hose Bib

Fire Dept.
Connection

Wall

Spoker
Brake
Valve

Water Flow
Switch

57
63

65

68

70

THE ALLEN EARLY 1998 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page C-1
June 28, 2007

## ATTACHMENT C

### WRITER'S RESPONSE TO CHUBB QUESTIONS

THE ALLEN EARLY 1998 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page C-2
June 26, 2007

Sheldon: We are in receipt of your preliminary report. Could you please supplement your report to address the following:

Please provide a complete description, with photographs, sketches, or diagrams of the sprinkler control valves that turn the sprinkler system on and off, as well as the drain valve. Drawings and photographs which convey the information requested were sent to your attention. This should include the location of these valves in the building, with comments on whether or not the valves are accessible to the public, and if they are not accessible to the public what is required to gain access to the valves, and information as to who had access to the valves prior to the fire. This is addressed in the written report. The sprinkler system can be shut off to the building only through the closure of the 8-inch valve in the basement or via the curb box valve in the street. The basement valve is not accessible to the public and its location and function is not readily apparent to the untrained eye. The curb box valve in the street is accessible to the public; however, the valve can be manipulated only through the use of a special wrench that is not normally available to the public. Additionally, without knowing the operations of the sprinkler system, the curb box valve would not be readily apparent to the untrained eye.

Was the sprinkler system fully operational at the time of the fire? No, the shut valve prevented operation of the sprinkler system. Did it function correctly during the fire? It was not allowed to function due to the shut valve.

If the sprinkler system was fully or partially not operational at the time of the fire why not? The sprinkler system was fully not operational due to the shut valve; it is unknown why or by whom the valve was shut.

Who had access to the sprinkler control valves? Unknown specifically as to who had access to the control valves. Presumably the valve would have been accessed only by the owner, tenants, or contractors. Is there an indication that any tenant or the owner had reason to shut off the sprinkler control? No specific indication as to reason for sprinkler system shut off.

Is there any requirement that the main sprinkler control valve be chained or secured in the open position? Based on the adopted fire code (1985 UFC) at the time of the incident there is no legal requirement to chain or secure the valve in the open position. However, from a standard of care perspective, it is reasonable and appropriate for the Fire Department, owner and contractors to follow and apply the provisions of NFPA 25 which would require the valve to have been electronically supervised or locked in the open position. If so, is there any evidence that this was done? There is no evidence to suggest that the valve was electronically monitored or locked into the open position.

00094

THE ALLEN EARLY 1998 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page C-3
June 26, 2007

What was the purpose/significance of the sprinkler control panel located in the building lobby? The significance is unknown at this time. According to the owner's statement, the alarm panel was not monitored by an outside agency. It is further unknown as to what devices if any were connected to the panel. Unless there were fire alarm devices (sprinkler system waterflow, manual fire alarm station, fire detection devices) or supervisory devices (valve tamper indicator) connected to the panel AND the panel was monitored by a constantly attended location, then the presence of the panel is likely insignificant. However, if the panel was displaying trouble or alarm signals prior to the fire, then it would have been incumbent upon the owner to have the source of the signal investigated and repaired. Have you inspected this device? I have not inspected the panel. If not please do so. (I will request photos of the panel from Bill Crookshank) If you have inspected it, please report on your inspection.

From August 1, 2006, to the date of the fire on March 7, 2007, had water ever been shut off to the sprinkler system, either in conjunction with shut offs of the domestic water supply or for any other reason? There is not enough evidence to make such conclusions.

What are the requirements in the City of Brawley for inspection, certification, maintenance, etc. of an automatic sprinkler system? Under the adopted fire code there are no specific inspection, testing and maintenance requirements for a sprinkler system. The City of Brawley is located in Imperial County, California. Does Imperial County have any requirements for the inspection, certification, maintenance etc. of an automatic sprinkler system? Imperial County has no jurisdiction, authority or responsibilities related to the Allen Early Building. Was the building in compliance with any such requirements?

Are there any state or federal requirements regarding inspection, certification, or maintenance of an automatic sprinkler system? There is no state or federal jurisdiction or authority over the Allen Early Building. Was the building in compliance with any such requirements?

Is it necessary to obtain a permit from either the local building authority, or the local Fire Department before working on or maintaining an automatic sprinkler system in the City of Brawley? Yes, a permit is required from the local fire authority for the installation, repair and modification of a sprinkler system. If so, have any such permits been requested or issued? There is no information that has been made available to date to indicate that permits have been issued for work on the sprinkler system.

Does the Brawley Fire Department, or the City of Brawley have any records regarding certification, maintenance, repair, or modification of the sprinkler system for the time period from August 1, 2006 through March 7, 2007? I have not

EXHIBIT "E"

00095

THE ALLEN EARLY 1988 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page C-4
June 26, 2007

observed or been provided with any written records related to the maintenance, repair or modification to the sprinkler system.

Re Building Code Information: The report indicates that its author has not been provided with information / documentation that a permit had been submitted by the owner. Please advise of efforts to check with either the owner, any tenants, or any government agency as to whether a permit was sought and granted. On April 12, 2007 I met with representatives of both the Fire Department and the Building Department and asked if permits had been issued related to work at the Allen Early Building. Both departments indicated that they were not aware of any permits that had been issued for the work at the Allen Early Building. We have not made efforts beyond those noted on April 12 to check into this further.

Fire Inspections: Report advises that Chief Contreras advised inspections are performed on request only. Is Chief Contreras aware of any inspections? My field notes from my discussions with Chief Contreras indicate that he is not aware that any inspections have taken place. If so, what were the results? Is the owner or tenant aware of any inspections? If so, what were the results?

Other relevant information & Observations: Report indicates that "it is more likely than not that the sprinkler system valve was closed by a fire protection contractor or other person knowledgeable in the sprinkler system operations." Who had access to the valves? Unknown. Who controlled access? Unknown. Are you aware of fire protection contractors having access? Not specifically. If so what are the details? Who would be a person knowledgeable in sprinkler system operations? A fire protection contractor. Is there any record or report of inspection, approval, or rejection of the sprinkler system? None that I am aware of.

Fire alarm panel: Report indicates a yellow light. Who advised of this information? Unknown specifically. It is my understanding that this observation came from Bill Crookshank. Are there other details? A yellow light typically indicates a "trouble" condition whereas a red light typically indicates an "alarm" condition.

Sprinkler system shutdowns: Are there records of any of these shutdowns? No. Any dates? Are there records regarding what contractors might have been involved in sprinkler system shutdowns? Not specifically. Were sprinkler discharges discussed with owner? I have not had any discussions with the owner.

Owner compliance: Report indicates the owner was not diligent in his efforts to understand and comply with requirements related to inspection and maintenance of the fire sprinkler system. Please advise as to your opinion of whether the owner was in compliance with inspection, testing, and maintenance of the system and a summary of the bases for your opinion. The codes state that the building owner/occupant shall operate and maintain their buildings in a safe and lawful manner and in compliance with applicable codes. Although the adopted fire

EXHIBIT "E"

THE ALLEN EARLY 1998 FAMILY TRUST
REPORT OF STEVEN A. SHELDON, P.E.

A42538 - Page C-5
June 26, 2007

code is not legally retroactive and does not provide specific guidance or criteria related to inspection, testing, and maintenance, it is still within the owner's standard of care to verify that his life safety systems are in adequate working order and are properly maintained. If the owner had contracted with a fire protection contractor to perform this service then it is expected that the contractor would have reported deficiencies to the owner based on current practices (i.e. NFPA 25) rather than what may have been legally enforced. Had this been the case it is likely that the owner would have been notified of requirements to lock or monitor the control valve and to provide 24-hour monitoring for the conditions of the life safety system(s). In summary, it is my opinion that the owner did not comply with the expected standard of care related to the inspection, testing and maintenance of the fire protection system. Additionally, there are specific requirements in the currently adopted code that requires the owner to obtain permits for work within the building, as well as to maintain all fire protection systems in an operative condition at all times and to provide a fire watch when entire fire protection systems are shut down; the owner clearly did not comply with these code requirements.

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 152019    — TC
* * C O P Y * *
June 17. 2008
15:02:27**

**Civ Fil Non—Pris**
USAO #.: 08CV1074
Judge..: BARRY T MOSKOWITZ
Amount.:                $350.00 CK
Check#.: BC218223

**Total—>  $350.00**

FROM: CHUBB CUSTOM INSURANCE
       VS.
       THE ALLEN EARLEY 1998 FAMILY T

BY FAX

*JS 44 (Rev. 12 07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
CHUBB CUSTOM INSURANCE COMPANY, A New Jersey corporation

**(b)** County of Residence of First Listed Plaintiff **New Jersey**
(EXCEPT IN U.S. PLAINTIFF CASES)

Ph:  310-203-4800
*CA, 90067-6006 *

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Tressler, Soderstrom, Maloney & Priess, LLP
1901 Avenue of the Stars, #450, Los Angeles,*

## DEFENDANTS
08 JUN 17 PM
THE ALLEN EARLEY 1998 FAMILY TRUST, A California trust; ALLEN EARLEY PLANTERS PROJECT, LP; DOES 1 THROUGH 10

County of Residence of First Listed Defendant **Imperial County, California**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

DEPUTY

**08 CV 1074 BTM CAB**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff    ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 442 Employment | Habeas Corpus: | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332
Brief description of cause: Declaratory relief that Plaintiff has no obligation under the insurance policy to cover the loss and damage to the Planters Hotel.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ to Defendants
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE                DOCKET NUMBER

DATE 06/13/2008    SIGNATURE OF ATTORNEY OF RECORD     (Paul S. White)

FOR OFFICE USE ONLY

RECEIPT # 152019    AMOUNT $350    APPLYING IFP    JUDGE    MAG. JUDGE

JAC 6/17/08


ORIGINAL

CR